**Paul V. MARKER, Plaintiff,**

v.

**Robert H. FINCH, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 3693.**

United States District Court
D. Delaware.

Feb. 22, 1971.

Eduard F. von Wettberg, III, of Morris, James, Hitchens & Williams, Wilmington, Del., for plaintiff.

F. L. Peter Stone, U. S. Atty., and Richard D. Levin, Asst. U. S. Atty., Wilmington, Del., for defendant.

## OPINION

LATCHUM, District Judge.

This is a civil action instituted by the plaintiff, Paul V. Marker ("Marker"), pursuant to section 205(g) of the Social Security Act ("the Act"), as amended, 42 U.S.C. § 405(g), for review of a final decision of the Secretary of Health, Education and Welfare ("the Secretary") which terminated Marker's disability insurance benefits as of January 1968 on the ground that Marker had ceased to be disabled as of November 1967.

The plaintiff filed an application on January 6, 1967 for the establishment of a period of disability, pursuant to section 216(i) of the Act, 42 U.S.C. § 416(i), and for disability insurance benefits, pursuant to section 223 of the Act, 42 U.S.C. § 423, and the regulations

thereunder. (Tr. 158–161).[1] On March 8, 1967 the Social Security Administration found that Marker had been disabled since January 18, 1966. (Tr. 162–163). Benefits were paid for a period beginning August 1966.[2] (Tr. 164).

On November 2, 1967, Marker was given a medical examination by Dr. Theodore B. Strange, an orthopedic surgeon, and a report was sent to the Social Security Administration's medical consultant. (Tr. 221). As a result, on January 25, 1968 the Social Security Administration decided that Marker's disability had ended in November of 1967.[3] (Tr. 165–166). On February 3, 1968 Marker was informed of this determination and of the fact that his benefits would cease as of the January 1968 check.[4] (Tr. 167). Marker promptly requested reconsideration (Tr. 169), but the Division of Reconsideration affirmed the determination. (Tr. 170–173).

The plaintiff on March 15, 1968 requested a hearing before a hearing examiner of the Bureau of Hearings and Appeals of the Social Security Administration. (Tr. 43). Hearings were held in May and July of 1968. On October 16, 1968 the hearing examiner upheld the determination that Marker's disability ended as of November 1967. (Tr. 12–36). The hearing examiner's decision became the final decision of the Secretary of Health, Education and Welfare when it was approved by the Appeals Council on January 29, 1969. (Tr. 4). By virtue of 42 U.S.C. § 405(g) that decision is now subject to review by this Court. The case is presently before the Court on the plaintiff's motion for summary judgment.

Marker was born February 6, 1917. He dropped out of school in the fifth grade. (Tr. 92–93). His I.Q. is normal. (Tr. 239). For more than eight years Marker had been employed as a truck driver hauling new cars. (Tr. 95–96). In January 1966 while unloading a car from his truck, he had an accident which seriously injured his back. (Tr. 101). With the exception of a five week period Marker has been unemployed since this accident. (Tr. 102).

In August of 1966 Marker was operated on by Dr. Strange. (Tr. 71). At that time a congenital anomaly of the lower back was found. (Tr. 72). The sacrum had a defect three centimeters in width running down about two inches. Nerve root dilation was also disclosed. (Tr. 72–73). A laminectomy revealed no herniated disc. (Tr. 73). In order to strengthen the back a spinal fusion was performed. (Tr. 73). Although

1. "Tr." refers to the pages of the transcript of hearings, exhibits, findings, etc., which was filed with the Secretary's answer to the complaint, as required by section 205(g) of the Act.

2. The "period of disability" began on January 18, 1966, as set forth in section 216(i) (2) (C) (i). The purpose of a "period of disability" is to remove this period of time from the calculation of retirement or death benefits; it, in and of itself, does not relate to disability benefits. See Jacobson v. Folsom, 158 F.Supp. 281, 284 (S.D.N.Y.1957). After a claimant has been found to be disabled, there is a six month "waiting period", as defined by section 223(c) (2). Disability benefits are not payable until the first month following this "waiting period", as set forth in section 223(a) (1) (i) of the Act.

3. Under the regulations adopted by the Secretary, disability ceases in

"(1) The month in which the impairment, as established by the medical or other evidence, is no longer of such severity as to prevent him from engaging in any substantial gainful activity or * * *

"(2) The month in which the individual has regained his ability to engage in substantial gainful activity * * *." 20 C.F.R. § 404.1539(a).

4. Benefits are paid for the month the disability ends and for the following two months. By virtue of section 216(i) (2) (D) (ii) of the Act the period of disability ends with the close of "the second month following the month in which the disability ceases" and by virtue of section 223(a) (1) disability payments must terminate as of the month preceding "the third month following the month in which [the] disability ceases."

the operation was a success, adhesions on the L-5 nerve root have caused pain which has continued. (Tr. 73–74).

Disability benefits granted to Marker under section 223 of the Act had been based upon the residual effects of the spinal fusion and nerve root adhesions, but reexamination in September 1967 was recommended.[5] No reexamination occurred until November 2, 1967. At that time Dr. Strange conducted an examination in his office and afterwards reported the following observations:

"Physical examination revealed a man standing erect. He is, however, tender on palpation of the low lumbar spine. His low lumbar spine appears flat and when he flexes and extends, he complains of a pain in the back at the level of the pelvis posteriorly, both right and left—thus, at the origin of the erector spinae muscles, the so-called posterior-superior iliac spine. The circumference of the calves are equal, however, there is a half-inch atrophy of the distal quadriceps on the left. Straight-leg raising on the left caused pain in the anterolateral thigh, left, and rotating the hip with the hip in extension at 180 degrees, I refer to the left, also caused pain in the anterolateral thigh. The reflex and sensation of the lower extremities are normal.

"Any individual that has had surgery in the form of a laminectomy and fusion has a permanent partial disability of his back and lower extremities. He should, therefore, avoid any occupation that requires long standing, shoving, pushing, or lifting. This is a permanent situation." (Tr. 221).

An earlier report of Dr. Strange, based upon a June 26, 1967 examination, was sent to the Social Security Administration's medical advisor on October 13. In it Dr. Strange reported that x-rays of the spine revealed "a solid fusion at the L5–S1 level." (Tr. 220). He stated that Marker's functional limitations "would be that of light work, thus, no lifting, shoving, heavy pushing, or long standing." (Tr. 220). In a report to an insurance company concerning Marker's condition Dr. Strange on April 27, 1967 reported:

"Physical examination of the trunk reveals that flexion and extension causes strain but no pain, straight-leg raising, flip and Laseque's sign are negative, the reflexes are normal. Thus, from an examination standpoint, he appears to have no radicular pain. I think it hard to be entirely objective about examining one of your own patients, perhaps he should be seen by another orthopedist.

"In a general way to answer your question, we feel that a man can return to light work from three to six-months after the surgery and to regular work by nine-months. As the surgery was performed last August, it would appear that in a few weeks he should be able to return to all activities." (Tr. 230).

On November 8, 1967, at the behest of the same insurance company, Marker was examined by Dr. Charles L. Reese, III, a neurologist. In his report Dr. Reese stated:

"The neurological examination reveals normal strength and muscle bulk in the proximal and distal lower rextremities, equal deep tendon reflexes, and flexor plantar responses. Pain, position and vigration sensations are normal, including dermatomes L-1 through S-3.

"*Impression*: The neurological examination reveals no abnormality today, and I should add that the straight leg raising test was normal bilaterally. The patient's symptoms and findings are not really consistent with L-5 root disease, since the straight leg raising test is normal, and since no evidence of L-5 compression was found at sur-

5. Disability was based upon regulation 20 C.F.R. § 404.1502(b) in that the disabling condition was neither "a listed impairment," contained in 20 C.F.R. § 404.-1539 App., nor "the medical equivalent," as defined in 20 C.F.R. § 404.1505.

gery. The only finding which suggests nerve involvement is the electromyogram performed on 6/9/67." (Tr. 235–236).

An orthopedic surgeon, Dr. Haynes B. Cates, also examined Marker for the insurance company. His report stated, in part:

"Physical Examination: The patient is able to walk without any evidence of limp. He can walk on his heels and toes without difficulty. Examination of the low back reveals a midline lumbar scar which is well healed. Spinal motions are slightly limited in all directions. The deep tendon reflexes are normal at all check points in both lower extremities. Straight leg raising is normal bilaterally. No weakness is apparent in either lower extremity." (Tr. 238).

At the hearing Dr. Strange stated in answer to a question about his future prognosis, "He's had plenty of rehabilitation. I would like to see him get the work and get going myself. It would be good for him emotionally. The whole situation would be a lot better." (Tr. 85).

Arthur I. Bierman, a vocational expert, testified at the hearing that, taking into account the psychological evaluation done of Marker by the Rehabilitation Division of the Delaware Board for Vocational Education (Tr. 239–240), the medical testimony and exhibits outlining the physical limitations of Marker, and the prior work experience related by Marker in his testimony, there were various types of light jobs which Marker could perform. (Tr. 128–130). Among those Bierman pointed out were the following: doing light assembly work in manufacturing, serving as dispatcher or performing light clerical operations in the trucking industry, driving light delivery trucks, driving a taxicab in a metropolitan area, serving as a guard or night watchman, or being a hand packer. (Tr. 130–134). To aid him in evaluating the effect of Marker's physical limitations on any potential employment opportunities Bierman was also allowed to question Dr. Strange. (Tr. 83–85).

Bierman testified as to potential job openings in the local economy in the occupations mentioned. He consulted a survey, made by the employment security office, on unfilled nonagricultural jobs in the Wilmington area. In addition, local newspaper advertisements were examined. Bierman also testified from his own personal experience as executive director of the occupational center of Essex County, New Jersey, as to possible job openings in the fields specified in the New York and New Jersey region. (Tr. 127; 138).

As a result of the testimony and exhibits presented, the hearing examiner found that Marker had the residual capacity and skill to work as a taxicab driver, light truck driver, assembler of electrical or electronic parts, hand packer, guard or watchman, or operator of simple machines. The hearing examiner also found that Marker had not presented evidence of severe, disabling pain of such a degree to prevent him from engaging in the fields of employment listed. (Tr. 34–35). The hearing examiner thus concluded that Marker was not under a disability as defined in sections 216(i) and 223 of the Act. (Tr. 35–36).

This case, unlike the majority of reported cases arising under sections 216(i) and 223 of the Act, involves a termination of disability benefits rather than an initial denial of benefits. However, the standards to be applied by the Court in reviewing a termination of benefits do not differ materially from those applied in reviewing a denial of benefits. A prior determination of the Secretary that a claimant had a disability which entitled him to benefits does not bar a later termination of those benefits. Dean v. Flemming, 180 F.Supp. 553, 556 (E.D.Ky.1959); Mayes v. Secretary of Health, Education, and Welfare, 300 F. Supp. 76, 79 (M.D.N.C.1968); see also Polotti v. Folsom, 167 F.Supp. 809, 811 (E.D.N.Y.1957), aff'd 277 F.2d 864 (C. A. 2, 1960). In a case in which benefits have been terminated, as in a case in

which benefits have been denied, the burden of proving disability is on the claimant, not on the Secretary. Watson v. Gardner, 246 F.Supp. 837, 838–839 (N.D.Ga.1965); Maynard v. Celebrezze, 209 F.Supp. 523, 524 (S.D.W.Va.1962). Thus the claimant has the burden of proving that his disability did, in fact, continue.

■ This Court's power of review under section 205(g) of the Act is limited to ascertaining whether on the record as a whole there is substantial evidence to support the Secretary's findings of fact. Jones v. Cohen, 295 F.Supp. 1302, 1304 (W.D.Pa.1969); Ferenz v. Folsom, 237 F.2d 46, 49 (C.A. 3, 1956), cert. den. 352 U.S. 1006, 77 S.Ct. 569, 1 L.Ed.2d 551 (1957).

■ Section 223(d) of the Act, 42 U. S.C. § 423(d) reads, in part:[6]

"(d) (1) The term 'disability' means—

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; * * *

\* \* \* \* \* \*

"(2) For purposes of paragraph (1) (A)—

(A) an individual * * * shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the im-

mediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

\* \* \* \* \* \*

"(5) An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."

These provisions were added to section 223 as part of section 158 of the "Social Security Amendments of 1967", Public Law 90–248, 1967 U.S.Code Cong. & Adm. News, p. 982.

The purpose of the 1967 amendments was set forth in the report of the Senate Finance Committee, Senate Report 744, 90th Congress, First Session, 1967 U.S. Code Cong. & Adm.News, pp. 2834 et seq. In its general discussion of the bill the Committee emphasized that one of the principal reasons why such an explicit definition of disability was added to the Act was the drastic expansion of benefit awards due to sweepingly sympathetic court decisions. 1967 U.S.Code Cong. & Adm.News, pp. 2880–2883. The rigid strictness of the new definition was emphasized in the Committee's explanation of section 158 of the bill. 1967 U.S.Code Cong. & Adm.News, pp. 3102–3104. The statutory standards will be applied by the Court in the light of this legislative history.

■ In the present case this Court finds that there is substantial evidence[7]

---

6. When a claim for disability benefits under section 223 is joined with a claim for a period of disability to be determined under section 216(i), the definition of "disability" found in section 223 applies to both claims. 42 U.S.C. § 416 (i) (1).

7. "Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal

in the record to support the hearing examiner's findings. Medical evidence indicated that Marker had undergone a fairly normal recovery from the August 1966 spinal fusion operation. While the medical evidence did indicate that Marker has a permanent partial disability of the lower back, his own physician, Dr. Strange, had no medical objection to his returning to work, and even testified that he would like to see Marker go back to work. (Tr. 85). There was no medical evidence offered by Marker which indicated that the disability he had previously had still existed in November 1967. There being nothing to controvert the medical findings of the hearing examiner, since those findings support the ultimate conclusion that Marker could perform light work, the Secretary's determination must be upheld. Woods v. Finch, 428 F.2d 469, 470 (C.A. 3, 1970).

The principal argument of Marker is that the Secretary's determination must be reversed because there was no evidence in the record to show that the jobs cited by the vocational expert could be filled by a person with Marker's acknowledged physical restrictions. This is wholly without merit for two reasons. First, the vocational expert testified that he took Marker's physical condition into account in ascertaining what jobs Marker could perform. (Tr. 129–130). Second, proof of whether a claimant would actually find employment in a particular job or type of job is not relevant to the question of disability under section 223, as amended in 1967. Gentile v. Finch, 423 F.2d 244, 246 (C.A. 3, 1970).

Regardless of this Court's opinion as to the desirability of having such stringent requirements for the award of disability benefits or of limiting with such strictness the statutory definition of "disability" under the Act, Congress has spoken in no uncertain terms and the law must be followed. See Cooper v. Finch, 433 F.2d 315, 316

(C.A. 5, 1970). Sympathy, like prejudice, has no place in the decision making process of this Court.

There being substantial evidence to support the findings of the Secretary, the plaintiff's motion for summary judgment will be denied and the decision of the Secretary will be affirmed.

An order will be entered in accordance with this opinion.

to direct a verdict were the case before a jury, then there is 'substantial evidence.' " Laws v. Celebrezze, 368 F.2d 640, 642 (C.A. 4, 1966).