Ethel Marie BYCE

v.

**AMERICAN HONDA MOTOR COMPANY, INC.**

v.

**Dennis PORTO, Individually and doing business as Conneaut Lake Rent-A-Honda, et al.**

**Patricia Ann Link WEISECKLE**

v.

**AMERICAN HONDA MOTOR COMPANY, INC.**

v.

**Dennis PORTO, Individually and doing business as Conneaut Lake Rent-A-Honda, et al.**

**Civ. A. Nos. 66–1275, 66–1274.**

United States District Court, W. D. Pennsylvania.

June 17, 1971.

George Shorall, Pittsburgh, Pa., for plaintiffs in both cases

Davis H. Trushel, Pittsburgh, Pa., for defendants in both cases.

## OPINION

ROSENBERG, District Judge.

Both plaintiffs in these consolidated cases have presented motions for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. At Civil Action No. 66–1274 in which Patricia Ann Weiseckle was the plaintiff, a motion by the defendant for dismissal for failure to meet the jurisdictional requirements of 28 U.S.C. § 1332 was granted after the plaintiff rested her case. At Civil Action No. 66–1275, in which Ethel Marie Byce was the plaintiff, the jury found in favor of the defendant, American Honda Motor Company, Inc.[1] These actions were instituted on the theory of strict liability to recover for damages sustained by each plaintiff, as a result of an accident involving a Honda motor bike.

The two plaintiffs were on a short vacation and on July 20, 1966, they rented a Honda motor bike from the Conneaut Lake Rent-A-Honda. The representative of the rental agency offered short, simple instructions to the would-be-operator, the plaintiff, Weiseckel. They were given a practice run around the premises of the Conneaut Lake Rent-A-Honda, and thereafter they were permitted to proceed out onto the highway, with the plaintiff Weiseckel in the operator's seat and the plaintiff Byce in the passenger's seat to the rear of the operator. They traveled for a considerable distance without undue incident, except on one occasion when the motor bike exhibited some jerkiness while stopping for a traffic signal. They subsequently turned around on the grounds of an abandoned gas station for the return trip. They continued on the return trip at about 35 miles per hour until they approached a left curve in the road and the operator observed an approaching automobile veering over the center line of the two lane highway. Seeing this, the operator of the Honda steered to the right in an effort to give the approaching automobile more space as it swerved to or over the center line. When she attempted to turn the bike to the left again, she was unable to do so. At the same time the speed of the Honda increased, and although the operator applied the brakes, even to the extent of standing[2] on them in order to reduce or stop the forward movement, the Honda accelerat-

---

1. These actions were instituted by the parents for the minor plaintiffs, who have since the filing of the actions become *sui juris*, and married.

2. See footnote 4.

ed and plunged into a sign post in or at the ditch abutting the roadway. The plaintiff Byce received injuries which resulted in her becoming a paraplegic, while injuries to the plaintiff Weiseckel were minimal.

The defendant, American Honda Company, joined Rent-A-Honda operator and William Shuey, the operator of the oncoming automobile as third-party defendants, but because no evidence of negligence on the part of either third party defendant was proved, the actions against the third-party defendants were dismissed. As an incidence of his being a third-party defendant, William Shuey testified (obviously in his own behalf) that he did not veer or swerve to his left over the center line as he approached the bike, but on the contrary, the two girls were negligent because the passenger was seated side-saddle in front of the operator.

During the trial, the plaintiffs abandoned their theory of defective steering and braking, and sought to prove defective design of the carburetor. It was alleged that the nut [3] attaching the cable of the throttle control to the carburetor, having no holding protection, loosened to such an extent as to cause an increase in the speed of the bike.

The plaintiff's expert witnesses testified that the loosening of the nut freed the plunger and needle mechanism in the carburetor chamber and allowed more gas to flow through the carburetor resulting in an increase in the speed of the bike. On the other hand, the defendant's expert witnesses testified that the nut attached to the cable could not become loose because of its constituted parts, and even if it could become loose, the loosening of the nut would result in too rich a fuel mixture and would decrease the engine speed or choke it because of the lack of air required for carburetion.

While the Honda was presented in evidence as an exhibit at the trial, no demonstration was made or attempted by any of the expert witnesses to show the practical application of their theories. The defendant not only attacked the plaintiff's theory, but also relied on the third-party's evidence of both plaintiffs' contributory negligence to the effect that the third-party defendant observed the passenger sitting side-saddle in front of the operator rather than astride in the passenger seat to the rear of the operator; that the operator could not control the Honda, and that because of the negligent positioning of the two plaintiffs, the accident occurred.

■ Under ordinary circumstances the verdict of a jury will not be disturbed. "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instruction, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considered most reasonable . . . Courts are not free to review the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944). See also Sentilles v. Inter-Caribbean Corp., 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959); Duncan v. Duncan, 377 F.2d 49, C.A. 6, 1967, cert.

---

3. Throughout the text of this opinion, this nut is variously referred to as the nut, the finger nut, the throttle housing nut, or the carburetor nut, or the end nut.

den. 389 U.S. 913, 88 S.Ct. 239, 19 L. E.2d 260 (1967): Levin v. Trans World Airlines, 201 F.Supp. 791 (W.D.Pa.1962).

In this case conflicting evidence was presented on two issues—first as it related to the testimony of the third-party defendant, that the passenger was seated in front of the operator and thus seriously obstructed the operator's freedom to operate and control the bike. If this was true, there would not be the slightest doubt of gross contributory negligence on the part of the plaintiff, and the jury would have been correct in its verdict for the defendant. But an examination of the physical construction of the bike presents evidence which contradicts the ability of a passenger to sit side-saddle in front of the operator while the bike is being driven. It seems quite obvious that sitting so for a moment would be quite a task, but to sit in such a position while the vehicle was being driven appears to be an almost physical impossibility—and this would be particularly true where, as here, one of the passengers was a bit stout. The obvious comfort and convenience of a passenger sitting in the specially provided seat to the rear of the operator contrasted with the highly difficult and precarious position of a passenger sitting or clinging—especially side-saddle—with the slightest sense of security and balance in front of the operator makes the testimony of the the third-party defendant exceedingly vulnerable. Additionally, one must consider that footholds were provided for a passenger's use, comfort and safety in the rear seat. Controverting this testimony was the additional fact that both plaintiffs left

the Honda rental agency with the operator in the front and the passenger in the rear, and their testimony that they never changed positions.[4] One may question whether the jury considered this evidence in its real light. One cannot say with any definitude on what testimony the jury relied, but from the verdict it seems conceivable that considerable emphasis might have been placed on the self-protecting testimony of the third-party defendant, Shuey.

The second and more critical phase of the case revolved about the contradictory testimony of the experts. Plaintiff's Exhibit No. 37 appears to be a simple device and yet while small, it is a carburetor basically planned in accordance with the underlying general principles of carburetors for internal combustion engines. The carburetor consists of a central vertical cylinder with a manual choke. Within this cylinder is the plunger and needle mechanism which regulates the accommodation of gasoline fuel and air in the carburetor. The main cylinder contains two adjustment screws for controlling the fuel and air mixture and is attached to the engine by two bolts. Attached to the vertical cylinder is a broader and shorter cylinder to which is attached a lever. This lever accommodates the inflow from the two gasoline sources. The bowl of this latter cylinder assumedly provides a supply of fuel to the vertical cylinder of the carburetor. There is a small vertical tube-like portion incorporated in this main cylinder, at the top of which is attached a short rubber tube evidently used for ventilating fumes. With the air thus entering from the top and the

---

4. If the passenger had taken a side-saddle position in front of the operator as the third-party defendant Shuey testified, the operator would have found it almost impossible not only to use her hand or her left foot to manipulate the controls, but additionally would have found great difficulty standing on the brake, as she testified. If the passenger had been seated to the rear, the standing position required for additional force on the brake would have also required the passenger to stand on her footholds and likely have caused additional unbalancing. This is here mentioned in the examination of all the evidence as a whole. If all the evidence in this connection were properly before the jury, it could draw logical inferences from such facts.

fuel coming in at a slightly lower level the carburetor provides a mixing chamber for the fuel and oxygen in the air in preparation for the process of exploding this mixture in the engine's single cylinder.

The concern which we have deals almost exclusively with the plunger and needle inserted in the main chamber. This is held in place by a spring and a finger nut. This is in turn attached to a cable connecting to the hand throttle on the right handlebar. The carburetor as designed always holds the spring at some tension between the head of the hand nut and the innermost portion to which the plunger and inserted needle may reach. When not activated the spring's tension holds the plunger and inserted needle so as to make a complete obstruction of the carburetor chamber, through which the mixture of fuel and air cannot move forward to the engine's cylinder for combustion. When the throttle is engaged the plunger and inserted needle is withdrawn, that is moved outwardly, permitting a quantity of the fuel-air mixture to travel downwardly into the engine. The degree of the opening in this chamber is directly related to the quantity of gas-air mixture moving into the engine, and consequently to the acceleration of the vehicle.

The mechanical apparatus is activated by turning the handle on the right handlebar. This in turn retracts the cable attached to the carburetor. As the cable is withdrawn, the tension of the spring increases, thereby withdrawing the plunger and needle to a point where the channel is opened to the flow of the fuel, and as the cable continues to be withdrawn the degree of tension in the spring increases, further withdrawing the plunger and needle and widening the aperture or channel opening accordingly, with the resultant greater flow of fuel and engine acceleration. While it is in its static position the spring presents resistance both to the end nut which holds the cable to the carburetor and to the plunger and needle. As the cable is withdrawn by turning the throttle, it pulls the entire plunger mechanism backwards creating a greater tension in the spring which is resisted by the hand nut. When the hand throttle releases the cable, the spring returns to its resting position causing the plunger and needle to obstruct the carburetor channel, thereby decreasing the fuel flow, or stopping it altogether, and imposing less resistance on the end nut. In fact one of the defendant's expert witnesses said, if the carburetor is broken, the resistance of the spring remains minimal and the plunger and needle remains within its normal position obstructing the inflow of the gasoline and air. Thus, it is the same as if the hand throttle is not used. From all of this examination, we can understand what happens if the finger nut is loosened. A simple observation of the exhibits here shows that this action causes the cable to pull away ever so slightly from the carburetor and as this occurs, the tension on the spring eases just as slightly and the plunger and needle withdraws outwardly, creating an avenue of free passage, however slight, for the mixture to move into the explosion chambers for engine motivation.

The finger nut itself requires only about two turns to become completely disconnected from its fingertip closed position. Testimony was presented that in the opinion of the plaintiff's expert, ". . . the locking nut on the carburetor that secures the cable to the carburetor became loose and backed itself off . . ." (Tr. pg. 432). If one assumes that the nut loosened and "backed itself off", this could have caused the plunger-needle mechanism to completely or partially disengage itself from the carburetor, thereby allowing a sudden increase in the quantity of fuel flowing through the carburetor into the engine, with a concomitant increase in the forward speed of the bike.

Loosening or detachment of this nut could have occurred in several ways such as for instance gradual easing of the nut or faulty attachment by a careless or hasty mechanic who could have misaligned the scant threading. However, no matter what caused the nut to loosen or disengage, if indeed this did occur, the result could easily have been a rapid increase in the forward speed of the bike.

We examine now, as best we can, the mechanical functioning as it was revealed by the experts on each side. The plaintiff's experts asserted that the nut could be loosened, that this could be done with the fingers without tools or force, and that the loosening of this finger nut provided for a greater flow of fuel resulting in an increase in the engine's speed.

The defendant's experts contradicted this testimony. One may examine the Honda bike and very easily prove the validity of the testimony of the plaintiff's experts. With the loosening of the nut and with the concomitant even slight withdrawal of the plunger and its inserted needle, it may be seen that the mixture of the air and fuel does gain passage space.

The defendant's experts testified that the loosening of the carburetor nut would cause an over-rich flow to the engine, but this was stated as I now view all the evidence as a conclusion by way of opinion, because there was no testimony on the record to show how either an over-rich solution or lean solution would cause engine slow-up when the nut is loosened, and nothing is obvious from the construction of the carburetor to indicate that such a possibility exists. In fact an examination of the carburetor exhibit reveals a finely devised mechanism which seems to allow for the introduction of air in comparative degrees as it allows for the inflow of fuel, depending upon the withdrawal of the plunger and connecting needle. And conversely it diminishes the intake of air in proportion as the plunger and needle decrease the intake of fuel, when the plunger and needle are being returned to their seats.

In a sense the comments I am about to present here are hindsight inspired by the plaintiffs' motion for a new trial. During the course of the trial I conjectured on the feasibility of having a demonstration conducted before the jury to test the conflicting theories of the experts. However, neither counsel proposed such a demonstration and I did not believe it incumbent upon me to do so. As I have analyzed the proceedings in an effort to make a determination of the plaintiffs' motions and reviewed the strategy of both counsel and the resulting evidence, I am now convinced that this was a substantial omission in evidence which did at least partially and perhaps critically, contribute to a miscarriage of justice. As such it could be construed to be error.

■■ I am presently led to believe that if such a demonstration had been conducted, the jury would have had an opportunity of weighing this significant evidence, in connection with all the other evidence in the case, and possibly have reached a different result. This is no longer speculation on my part, as shown by the questions presented by me to the defendant's expert witnesses and what followed after the presentation of the motions for a new trial. Ordinarily contradictory statements must be left for the jury's resolution. Boeing Company v. Shipman, 411 F.2d 365, C.A.5, 1969. But when contradictory statements are made by expert witnesses regarding the functioning of a specific machine, and when those statements lend greater credibility to the experts of one side, then it would seem that the reasonableness of the particular inference or conclusion drawn by the jury from such expert's testimony becomes a focal point of judicial review. However, the court may not arbitrarily substitute its judgment for that of a jury, where the finding of the jury can be supported by the evidence. C. R. Grove, Trustee v. Dun &

Bradstreet, Inc., 438 F.2d 433, C.A.3, 1971.

■ While I, as the trial judge, may regard the ultimate decision of the jury as a miscarriage of justice, that alone is not a sufficient basis for me to say that it must be set aside. If the verdict is supported by substantial evidence, I am bound by the jury's verdict.

The defendant's expert witness, David T. Yett, at page 819 of the transcript, testified on cross-examination that

"Q. All right. But as far as the nut is concerned, you could remove it with your hand and put it on with your hand, and you did so in Mr. Trushel's apartment on October 5th, 1969?

A. That is correct."

And at page 818:

"Q. When you put it back, when you took it off and put it back on, did you do so with a tool?

A. No, sir. It can be done by hand."

And at page 803:

"Q. Mr. Yett, assuming that the throttle housing nut came loose as suggested by Mr. Booth and Mr. Messmer, what would be the effect on the speed of the motorcycle?

A. *The effect on the speed of the motorcycle as it is being ridden is negligible.*" (emphasis supplied)

The evidence of another of the defendant's expert witnesses, Mr. Nicholson, reiterated the testimony to the effect that the loosening of the nut would have no effect upon the speed of the bike. A noteworthy revelation lies in the testimony presented by this witness on the mechanical functioning of the piston and needle in the carburetor to which the throttle cable is attached through the

finger nut and as the nut resists the compressed spring.

In direct examination, Mr. Trushel asked this witness at page 928:

"Q. Now, getting to the throttle housing nut, Mr. Nicholsen, in your professional opinion, would the loosening or coming off of the throttle housing nut result in the motor running wild?

A. No, it would not.[5]

Q. And why would it not?

A. I conducted various tests—

THE COURT: Well, before you go into what you did, why would it not, and then you may be able to explain afterwards.

A. Yes. Because the loosening of the nut would not allow the throttle to open further because of the action of the throttle spring and the support of the throttle cable."

And at page 932:

"THE COURT: When there is not acceleration at all, what is the position of the cable and the spring?

A. They are in a static condition. The spring is under compression.

THE COURT: In other words, the spring pushed towards the cable and the nut?

A. Yes. It pushes toward the throttle valve and toward the nut. The spring is at all times in a state of compression.

THE COURT: We understand that. It has more compression when the cable moves forward.

A. When the throttle opens."

\* \* \* \* \* \*

"THE COURT: That is right. So whenever it is not accelerated in any way at all, then the spring

---

5. This, too, seemed erroneous, because logically with the nut removed, the plunger and needle no longer obstruct the flow of fuel.

is at its furthermost or less stressful point.

A. Yes. The compression on the spring is at its minimum on the closed throttle position.

THE COURT: It is stressed more when the accelerator is turned on?

A. Correct your Honor.

THE COURT: And the more the accelerator is turned on, the more the spring is stressed?

A. That is quite so.

THE COURT: Now, then, when the spring is more stressed, then there is more gasoline and air being furnished to the cylinder so that combustion and the proper forces take place in the cylinder.

A. Yes."

And at page 934, Mr. Trushel asked:

"Q. Just to follow that up with one question, the effect of the spring then is to close the throttle?

A. That is the function of the spring, to positively close the throttle."

This last statement was not precisely accurate, because it is obvious that the function of both the spring and the finger nut in combination is "to positively close the throttle". Without one or the other there would be no such function and the fuel would flow unimpeded. As I heard the testimony of Nicholson at the trial of the case, I was persuaded towards the logic that it was possible for the compression to lessen if the finger nut was loosened and so the positive closing of the throttle would become defeated and passage of fuel and air would be permitted, the extent of which depended upon how many turns the finger nut became loosened and to what degree the compression was eased by the loosening of the nut.[6]

When the motions for a new trial were filed and with the recollection of Mr. Nicholson's original testimony recurring, it struck me as a possibly serious unexplained discrepancy. At the trial I asked questions for the purpose of clarifying the evidence for the jury, but as of that time I had a distinct feeling that the evidence had not been clarified and is not yet resolved so far as a motion for a new trial is concerned, in spite of the jury's verdict in favor of the defendant.

■ My function now is to examine the evidence for the purpose of ascertaining whether there is substantial support for the verdict as rendered by the jury and so on these motions I view the evidence favorably to the defendant. Warner v. Billups Eastern Petroleum Company, 406 F.2d 1058, C.A.4, 1969.

■ I have examined and re-examined the evidence in this case, and particularly the evidence of the experts, in an effort to support the jury's verdict. In examination of Exhibit No. 37 which contains a connecting cable and carburetor similar to that contained in the bike, I found no such support. Rather the examination of this particular exhibit persuaded me otherwise. The loosening of the finger nut on the carburetor was ef-

---

6. The defendants' experts also gave the distinct impression that the loosening of the carburetor nut would cause an immediate flow of too rich a fuel into the carburetor and that that would cause the engine to choke and stop. However, an examination of Exhibit 37, the carburetor seems to show a finely worked-out device which measures proportionately the intake of air to gas as the plunger and needle allow for the intake of fuel. Thus fuel and air are automatically measured and admitted so as to prevent both over-richness of the fluid intake, as well as for over-leanness. The added intake, accordingly allows only increased intake power, which in turn is converted to acceleration of speed. Over-rich fuel would have to be by mechanical adjustment, but once adjusted, such a mixture remains stable for increasing or reducing engine acceleration.

fected by a thumb and finger twist, and resulted in decompression of the spring, and therefore less force being placed upon the carburetor plunger and needle.

The truth or accuracy of the defendant's theory presented a significant doubt in examination of all the evidence as a whole. I was aware of the fact that the jury may have believed the third-party defendant's testimony to the effect that the girls had been wrongfully positioned and were therefore contributorily negligent. We may safely speculate that this secondary evidence would likely not have been believed if the focal evidence of mechanical functioning of the carburetor and its results were differently set forth. Thus, the overall, serious question for the jury's determination was the truth of the conflicting expert testimony as presented by the plaintiff and the defendant. Either the loosening (or even detachment) of the nut did no harm and could do no harm at all as was contended by the defendant, or the loosening (or detachment) of the nut could and did cause a speeding up of the engine with the possible consequential injuries to the plaintiff. This critical question should not be made insignificant by any evidence of the third-party defendant to the effect that the two plaintiffs were sitting in an impossible position.

Accordingly, as a matter of necessity, I felt that the conflicting theories of the parties should be tested by a demonstration. Therefore, based upon required judicial inquiry, after argument on the motions for new trial, I requested counsel to meet with me, the court reporter, a clerk, my law clerk and bailiff, for a demonstration of the Honda, which was the subject matter of this case. This demonstration was held in a conference room.

Acting upon my instructions in the presence of these individuals my bailiff started the engine and thereafter loosened the finger nut easily with the two fingers of his right hand. With the loosening of the nut the engine suddenly accelerated at a high rate. I felt that this one trial alone was not fair and when a repeat performance was attempted, the engine did not turn over because it seemed the battery had run down or an accumulation of carbon in the carburetor interfered with its orderly operation. I then requested counsel to have the engine put into ordinary running condition for the purpose of providing a fair demonstration. Counsel for the plaintiffs agreed, but counsel for the defendant refused to participate in any further demonstration.[7]

While we all saw the engine specifically accelerate upon the loosening of the nut, from this one demonstration, I would not conclude that the theory of either side was proved or disproved, because I am not unaware of the fact that a newly started engine would be normally accelerated or advanced at the start, although I was also aware of the fact that the engine started slower, but speeded up when the finger nut was loosened. I am also aware of the fact that it would not be a fair test when the carburetor had been idle for a long period of time and could have accumulated carbon, with other influencing factors if there had been normal running of the bike. Nevertheless, from all of this, I am a little more persuaded that the defendant's theory is not supportable from an examination of Exhibit 37, from the demonstration and from the testimony of the defendant's expert witnesses.

From the trial as a whole I was unusually struck with an inexplainable uneasiness of something being wrong, but

---

7. I am inclined to draw the inference that counsel for the defendant believed that such a demonstration would not support his expert's testimony. However, I am more inclined to rely upon reality, whatever that may be, by a proper demonstration at the proper time.

I attributed this to, perhaps, sympathy for a young girl—paralyzed from the waist down—and so abandoned this uneasiness to the thought that the jury functioned well indeed, since sympathy like prejudice has no place in a legal proceeding. Marker v. Finch, 322 F. Supp. 905 (D.C.Del.1971). Now, after careful examination of the transcribed evidence and the exhibits, I have the distinct impression that there has been a miscarriage of justice. Caporossi v. Atlantic City, N. J., 220 F.Supp. 508 (D. C.N.J.1963), aff'd. 328 F.2d 620, C.A.3, 1964, cert. den. 379 U.S. 825, 85 S.Ct. 51, 13 L.Ed.2d 35.

▮ As I stated previously, the verdict of a jury will not ordinarily be disturbed where that verdict is sustainable on the weight of the evidence. C. R. Grove, Trustee v. Dun & Bradstreet, Inc. *supra*. In considering a motion for a new trial, it is not the function of a trial judge to substitute his opinion for that of a jury, merely because the jury could have reached a different result. Gebhardt v. Wilson Freight Forwarding Company, 348 F.2d 129, C.A.3, 1965; Fassbinder v. Pennsylvania Railroad Company, 322 F.2d 859, C.A.3, 1963. However, a federal trial judge has a heavy responsibility beyond that of being a mere referee at a judicial proceeding. Heron v. Heron, 393 F.2d 652, C.A.3, 1968; Cromling v. Pittsburgh & Lake Erie R.R. Co., 327 F.2d 142, C.A.3, 1963; Faudree v. Iron City Sand & Gravel Company, 315 F.2d 647, C.A.3, 1963. As the Court stated in Russell v. Monongahela Railway Company, 262 F. 2d 349, 353, C.A.3, 1958:

"The trial judge in a federal court is not a mere presiding officer. It is his function to conduct the trial in an orderly way with a view to eliciting the truth, and to attaining justice between the parties. It is his duty to see that the issues are not obscured, that the trial is conducted in a proper manner, and that the testimony is not misunderstood by the jury, to check counsel in any effort to obtain an undue advantage or to distort the evidence, and to curtail an unnecessarily long and tedious or iterative examination or cross-examination of witnesses."

▮ Appellate courts may grant relief upon a finding that the trial court's determination has been clearly erroneous. Pennsylvania Railroad Co. v. S.S. Marie Leonhardt, 320 F.2d 262, C. A.3, 1963; Rubin v. Equitable Life Assurance Soc. of U. S., 297 F.2d 167, C. A.3, 1961; Invengineering, Inc. v. Foregger Co., 293 F.2d 201, C.A.3, 1961; O'Brien v. Westinghouse Electric Corp., 293 F.2d 1, C.A.3, 1961; United States ex rel. Binion v. O'Brien, 273 F.2d 495, C.A.3, 1959, cert. den. 363 U.S. 812, 80 S.Ct. 1249, 4 L.Ed.2d 1154 (1960). And a court of appeals likewise has the power to override the findings of a trial judge where on the whole it is convinced that a mistake has been made, Consolidated Water Power & Paper Co. v. Spartan Aircraft Co., 185 F.2d 947, C.A.3, 1950; or where upon considering all of the evidence, it is left with the firm conviction that a mistake has been made by the fact-finder, Soderhamn Machine Manufacturing Company v. Martin Bros. Con. & T. Pr. Corp., 415 F.2d 1058, C. A.9, 1969; Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. v. Metal-Matic, Inc., 323 F.2d 903, C.A.8, 1963; Williams v. Babcock & Wilcox Co., 262 F.2d 253, C.A.3, 1959. While an appellate court will generally grant relief when it is convinced that a miscarriage of justice has occurred, it becomes incumbent upon a trial judge to grant similar relief where he strongly feels that a similar miscarriage of justice has resulted from a distortion, obscuration, or misconstruction of the evidence leading to seriously erroneous results. McGuire v. Davis, 437 F.2d 570, C.A.5, 1971; Meehan v. Gulf Oil Corporation, 312 F.2d 737, C.A.3, 1963; Blackburn v. Aetna Freight Lines, Inc., 250 F.Supp. 289 (W.D.Pa.1966), affirmed 368 F.2d 345, C.A.3, 1966; Gardner v. Vogel, 237

F.Supp. 119 (E.D.Pa.1964); Caporossi v. Atlantic City, New Jersey, *supra*.

One other matter bears mentioning. The plaintiff presented Wilbert Messmer, a garage mechanic as an expert witness. During the course of cross-examination it was revealed that this witness had a sign over his garage which read "Jumbo's", and during cross-examination, counsel for the defendant instead of saying Mr. Messmer repeatedly addressed the witness as "Jumbo". While in itself this might not have any character of debasement, it did have an element of sarcasm, and so by repeated use as a means of addressing him, it could have amounted to ridicule for the purpose of discrediting the witness.

Our system of justice, television and motion pictures notwithstanding, must always be conducted in a dignified manner. Anything which detracts from such orderliness should not be indulged in by judges or counsel, for the court must protect the rights and dignity of witnesses. Hawkins v. United States, 114 U.S.App.D.C. 44, 310 F.2d 849, 1962. Every witness who comes into court is entitled to be greeted in a courteous manner, and if a nickname is to be used repeatedly, it should be used in such a manner as may prevent bias or prejudice because of the name. This nickname may or may not have had a bearing upon the jury's attitude towards the plaintiff because of the address occasioned to one of the plaintiff's witnesses, but added to the other described factors it very well may have been prejudicial.

Just what caused the jury to bring in their verdict is something that I shall not know, nor ordinarily is it the business of a trial judge to know. But where credibility is made an obvious factor based upon artificial or unreasonable evidence, it would seem that a new trial would be in order. This was expressed in Tennant v. Peoria & P. U. Ry. Co., *supra*, "The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury." While it is the jury, not the court, which is the fact-finding body, and a trial judge must abstain from interfering with the jury's verdict, as previously said, the trial judge should not hesitate to do so when it is clear that the jury has reached a seriously erroneous result.

Accordingly, because the motion of the plaintiff Patricia Ann Weiseckle at Civil Action No. 66–1274 for a new trial presented no basis for the same, it will be denied. The motion of the plaintiff Ethel Marie Byce at Civil Action No. 66–1275 for a new trial will be granted.