**Russell H. MAHER, Plaintiff,**

**v.**

**Caspar WEINBERGER, Secretary of the Department of Health, Education and Welfare, Defendant.**

**Civ. A. No. 4759.**

United States District Court, D. Delaware.

July 3, 1974.

---

Russell H. Maher, pro se.

Ralph F. Keil, U. S. Atty., and Alan Hoffman, Asst. U. S. Atty., Wilmington, Del., for defendant; Stephanie W. Naidoff, Regional Atty., and Roland L. Vaughan, Jr., Asst. Regional Atty., Dept. of Health, Education and Welfare, Philadelphia, Pa., of counsel.

## OPINION AND ORDER

STEEL, Senior District Judge:

By a decision dated January 28, 1969, the Secretary found plaintiff eligible for, and plaintiff in fact received, disability benefits commencing August 23, 1967 under the Social Security Act[1] (the "Act"). Plaintiff's entitlement to benefits, however, was ended on August 31, 1972, after a review of his claim file by the Social Security District Office in Wilmington, Delaware.[2] The review resulted in a determination that plaintiff's disability had ceased in June, 1972, because plaintiff had completed a "trial work period"[3] and had engaged in "substantial gainful activity"[3] (Tr 207–208). Plaintiff's request for reconsideration of this decision produced a like result (Tr 209–212). After a hearing before an Administrative Law Judge (the "Judge") held on April 12, 1973, at plaintiff's request, the Judge ruled on July 23, 1973, that plaintiff's "entitlement to a period of disability and disability insurance benefits ended effective with the close of August, 1972" (Tr 37).

In support of his decision, the Judge found that plaintiff had performed "services"[4] during a trial work period which had been completed before June, 1972. In addition, the Judge made the following findings:

"4. That the claimant was engaged in substantial gainful activity while employed at the YMCA at various times beginning in December of 1969 and thereafter, and when employed as an electrician beginning in the second quarter of 1972 and thereafter.

5. That the claimant regained his ability to engage in substantial gainful activity no later than June 1972.

6. That the claimant was suffering from a 'disability' which began August 23, 1967, and continued for at least 12 months thereafter, but such 'disability' terminated in June 1972."

The decision of the Judge was upheld by the Appeals Council when it denied review on October 1, 1973 (Tr 5). In accordance with regulations promulgated under the Act, the Judge's decision is the final decision of the Secretary,[5] and is subject to judicial review. 42 U.S.C. § 405(g).

The present action was brought by plaintiff to review the Judge's decision terminating disability benefits. Paragraph 4 of the complaint asserts that the "decision of the Appeals Council" is not in accordance with the law or the facts and "is against the evidence in that plaintiff has been disabled since

---

1. 42 U.S.C. § 301 et seq.

2. The Secretary has the authority to suspend the payment of benefits under the Act "on the basis of information obtained by or submitted to him" which leads him to believe that an individual entitled to benefits has ceased to be under a disability. The Secretary may continue the suspension until it is finally determined whether or not the disability has ceased. 42 U.S.C. § 425.

3. Discussed *infra.*

4. Discussed *infra.*

5. 20 C.F.R. §§ 404.947, 404.951.

August 23, 1967, and continues to be disabled." The complaint prays that "the decision of the Appeals Council be reversed, that plaintiff's claim for benefits be allowed, and that defendant be ordered to make disability payments to him." [6] The defendant, seeking an affirmance of the Judge's decision, has moved for summary judgment.

■■ The sole issue for this Court's determination is whether the final decision of the Secretary is supported by substantial evidence. When, as here, the issue is whether benefits previously granted should be terminated, the burden of proving a continuance of disability is on the plaintiff, as is true when the issue is one of the plaintiff's initial disability. Marker v. Finch, 322 F.Supp. 905, 909 (D.Del.1971). In assessing whether the plaintiff has carried the burden of proving his disability, the beneficent purposes of the Social Security legislation require that a more tolerant standard be used in the administrative proceeding than is applicable in a typical suit where the adversary system prevails. Hess v. Secretary of Health, Education & Welfare, 497 F.2d 837 (3rd Cir. 1974).

Plaintiff presently is 39 years old. He is a graduate of high school and attended one year of college before graduating from an electrical trade school in 1962 (Tr 300–301). He worked as an electrician for approximately 10 years (Tr 177) and was working in that capacity immediately before applying for disability benefits.

The evidence before the Judge can be divided into three areas: (1) medical evidence which existed when on January 28, 1969, plaintiff was initially found to be under a disability beginning August 23, 1967, (2) evidence of plaintiff's employment from December, 1969 through September 1972, and (3) up-dated medical evidence through June, 1973.

### Medical Evidence Up To January 28, 1969

The record contains plaintiff's medical history dating back to 1949. This evidence indicates that plaintiff underwent successful surgery for "coarctation of the aorta" in 1949, had two serious brain operations to control hemorrhaging resulting from the rupture of cerebral aneurysms in 1963, and developed epilepsy which had its advent in January 1964. In addition, plaintiff in 1964 was committed to Delaware State Hospital for severe depression stemming from the latter operations and in large measure from his wife's leaving home with their four children, a situation which later culminated in a divorce. He had several trial visits before being discharged finally on June 19, 1966 (Tr 113).

In 1968, plaintiff was evaluated by five physicians whose diagnoses of plaintiff's impairments and employment possibilities are not in agreement. On March 16, 1968, Dr. Polischuk, a general practitioner specializing in pediatrics, stated that plaintiff was under his care for, among other things, epilepsy, and that he had been "unable to work since 4 Jan. 68" [7] (Tr 192–193). Dr. Ivins, specializing in psychiatry and neurology, reviewed plaintiff's medical history and diagnosed his problem on June 6, 1968 as "Organic Brain Syndrome, chronic Epilepsy, acquired" (Tr 179). His prognosis was "[f]air to guarded". His recommendation was:

"Mr. Maher is prepared to return to school and will begin classes with the BVR at the IBM, on July 8, 1969 for 18 weeks. He should be able to complete this course while on drug thera-

6. Plaintiff's references to the Appeals Council's decision in the complaint shall be construed by the Court as being directed to the decision of the Judge.

7. Dr. Polischuk's notation that plaintiff was "unable to work" is subject to two interpre-

tations. It could document a fact related to him by plaintiff or perhaps reflect his objective medical opinion as to plaintiff's employment capabilities.

py and under supervision. He had done this type of work up until 10 years ago.

I recommend reevaluation within one year to determine progress." (Tr 179).

On July 25, 1968, Dr. Durham, a specialist in internal medicine and cardiovascular disease, stated that in his opinion plaintiff was "totally disabled" (Tr 129). This terse conclusion is of scant value in assessing whether plaintiff's disability under the Act has been shown. Not only is it not determinative of the question of disability,[8] it is not helpful as medical evidence without some amplifying analysis which relates the diagnostic "disability" to the statutory meaning of the term.

Dr. Olmedo, a neurological surgeon, noted on August 30, 1968, (Tr 151):

"Patient still has some clumsiness of the left hand and arm—He needs further training for rehabilitation—In the mean time I understand he is not able to perform his usual work as an electrician."

A neurologist, Dr. Oleynick, medical consultant for the disability branch of the Social Security Administration, on September 18, 1968, summarized his findings as follows:

"The medical evidence would indicate that the WE [wage earner] has had a coaractation of the aorta as well as cerebral aneurysms both of which have responded very nicely to surgery. His two biggest problems, that of a depressive reaction, seems to be well under control; and in addition, his seizures also seem to be under control. He has obviously not had a seizure in over a year although he has small auras which would not interfere with his work. He has been labeled chronic brain syndrome or organic brain syndrome which diagnosis is really not suited for him, but repeatedly crops up undoubtedly because of the book of nomenclature. He does not have any organic deterioration and has only seizures. It is therefore felt that he would be able to [do] (sic) all kinds of work except those types of work requiring working in high places, driving motor vehicles or working with dangerous machinery." (Tr 183).

Finally, Dr. Olmedo on September 23, 1968, wrote to plaintiff stating:

"If you cannot work as an electrician, most certainly I feel that further training, such as the one you had tried with IBM, will be the proper one you should undertake to go through the present difficult situation. Remember, that if you have troubles, they never will last 100 years; and sooner or later things will clear up for you, as has been for everyone looking hard for rehabilitation possibilities." (Tr 197).

*December, 1969—September, 1972 Employment Record*

In December 1969, plaintiff went to work for the Chester, Pennsylvania YMCA and continued as an employee there for about a year (Tr 51), working part-time 15 to 20 hours per week for $1.60 per hour (Tr 50). The work was essentially a desk job where plaintiff answered the telephone and made change (Tr 50). The job ended when plaintiff left to visit his mother in Florida in mid-December 1970. Upon his return several weeks later he learned that the job was not available (Tr 53). He did not work until mid-December 1971, at which time he was again employed by the YMCA in Chester. His rate of pay was still $1.60 per hour (Tr 54). He

---

8. The Secretary alone has the responsibility of determining disability. Dr. Durham's diagnosis is a conclusion upon the ultimate issue to be decided by the Secretary and as such:

"[t]he weight to be given such physician's statement depends on the extent to which it is supported by specific and complete clinical findings and is consistent with other evidence as to the severity and probable duration of the individual's impairment or impairments."

20 C.F.R. § 404.1526.

was fired (Tr 54) in mid-February, 1972 (Tr 53). With the exception of December 1971, in which plaintiff earned $207.90 for the month (Tr 266), his earnings never exceeded $130 a month while he worked for the YMCA (Tr 265–274).

The Judge's finding that plaintiff had completed a "trial work period" prior to June 1972, was consonant with the requirements of the Act and regulations enacted thereto. Plaintiff's YMCA employment exceeded the nine-month trial work period prescribed by 42 U.S.C. § 422(c) and constituted "services" defined in 20 C.F.R. § 404.1536(d) as:

". . . any activity, even though not substantial gainful activity, which is performed by an individual in employment during a period of trial work for remuneration or gain, or which is determined to be of a type normally performed for remuneration or gain. Work performed without remuneration merely as a therapeutic measure or purely as a matter of training, or work usually performed in daily routine around the home or in self-care, is not considered 'services' ".

Plaintiff asserts that his "duties were at best therapeutic in nature". His receipt of wages in return for work performed, however, renders that portion of the regulation inapplicable to plaintiff even though the work may have had therapeutic value to him. Furthermore, under 20 C.F.R. § 404.1536(a), the services rendered by plaintiff at the YMCA could be considered by the Judge "in determining whether [plaintiff's] disability ceased at any time after the expiration of such period of trial work." [9]

In June 1972, plaintiff worked for Catalytic, Inc., for some two and a half weeks, eight hours per day, five days per week, for which he earned $699.48 (Tr 297). He was hired as an electrician and obtained the job through his own local electricians' union, and was not fired but quit the job of his own volition (Tr 56, 253–254). In July 1972, plaintiff went to work as an electrician for Bechtel Corporation, working 8 hours per day, 3–4 days per week. He earned approximately $2,382.04 (Tr 297) until he was fired in September, 1972 (Tr 57, 249). The reason for termination was plaintiff's absenteeism on several dates, but he was considered eligible for rehire by the corporation (Tr 292).

The Judge specifically found, *supra*, that plaintiff's employment as an electrician, and at various times his YMCA job, demonstrated his ability to engage in "substantial gainful activity." The Act empowers the Secretary by regulation to "prescribe the criteria for determining when services performed or earnings derived from services demonstrate an individual's ability to engage in substantial gainful activity." 42 U.S.C. § 423(d)(4). If an individual's services or earnings meet the criteria so established, he shall be found not to be disabled. The Secretary has promulgated such regulations.

"Substantial gainful activity" is defined in 20 C.F.R. § 404.1532(b) as:

". . . work activity that is both substantial and gainful. Substantial work activity involves the performance of significant physical or mental duties, or a combination of both, productive in nature. Gainful work activity is activity for remuneration or profit (or intended for profit, whether or not a profit is realized) to the individual performing it or to the persons, if any, for whom it is performed, or of a nature generally performed for remuneration or profit. In order for work activity to be substantial, it is not necessary that it be performed on a full-time basis; work activity per-

---

9. Plaintiff argues in a letter to the Court dated May 10, 1974, that the "trial work" criteria are inapplicable to him because he filed a "new" application on October 20, 1972, for disability benefits (Tr 214–217). The record does not disclose what became of this application other than its receipt by the Wilmington Social Security District Office on October 31, 1972. Inasmuch as it has apparently not been acted upon by the Secretary, plaintiff's argument in this regard shall not be considered.

formed on a part-time basis may also be substantial. It is immaterial that the work activity of an individual may be less, or less responsible, or less gainful, than that in which he was engaged before the onset of his impairment."

The definitional boundaries of "substantial gainful activity" are further delineated in 20 C.F.R. § 404.1532(d) which states in part:

" 'Made work, that is, work involving the performance of minimal or trifling duties which make little or no demand on the individual and are of little or no utility to his employer, or to the operation of a business, if self-employed, does not demonstrate ability to engage in substantial gainful activity."

The YMCA desk job was certainly not "made work", as plaintiff's services were of utility to his employer and at least during December, 1971, when plaintiff earned over $200.00, it was productive work for remuneration. Similarly, there can be little doubt that plaintiff's employment as an electrician, his prior livelihood, during the summer of 1972, met the standards under the Act. Plaintiff's testimony and arguments notwithstanding,[10] there was clearly substantial evidence to support the Judge's finding that plaintiff's employment demonstrated his ability to engage in substantial gainful activity.

The regulations provide additional criteria for ascertaining an individual's ability to engage in substantial gainful activity. With respect to earnings derived from employment by an individual receiving disability benefits, 20 C.F.R. § 404.1534(a) notes generally that:

". . . activities which result in substantial earnings would establish

ability to engage in substantial gainful activity; however, the fact that an individual's activities result in earnings which are not substantial does not establish the individual's inability to engage in substantial gainful activity."

More specifically, 20 C.F.R. § 404.1534(b) creates a rebuttable presumption that earnings averaging over $140 per month demonstrate an individual's ability to engage in substantial gainful activity. By either of these standards, plaintiff's earnings at the YMCA in December 1971, and his wages as an electrician qualified him as able to engage in substantial gainful activity.

*Updated Medical Evidence*

Since there had been no medical evidence concerning plaintiff's condition for a period of almost five years, and in the interim plaintiff had demonstrated his ability to work, at least for a period of this time, the Judge was acutely aware of the need for a current medical evaluation of the plaintiff, which he attempted to obtain. At Tr 27 the Judge said:

"Because of the seriousness of [plaintiff's] prior surgery, his related medical situation, the absence of any medical information since September 1968 . . . as of the 1973 hearing, and because the record establishes that [plaintiff] completed a trial work period, current psychological and medical evaluations were deemed appropriate. Also, as [plaintiff] testified at this recent hearing, that Livio Olmedo, M.D., a Board Certified Neurological Surgeon, had continued to provide him with prescriptions, the Administrative Law Judge wrote to Dr. Olme-

---

10. Plaintiff characterizes his employment with Catalytic, Inc. and Bechtel Corporation as:

> "the extreme charity of being paid for my presence on a construction job site as a knowledgeable but unproductive electrician."

He contends that his fellow workers "hid" him from management and gave him "unnec-

essary and less than minimal duties." Whatever actual work was performed by plaintiff, the fact remains that he earned a significant wage, apparently equal to the union rate at the time, and the evidence of employment at these corporations (Tr 249–250, 253–254, 292, 299) would not support plaintiff's view that the work was unproductive.

do on April 13, 1973 to update the situation."

The medical evidence which was adduced partially as a result of the Judge's actions consisted of a letter from Dr. Olmedo and an incomplete psychological examination and report by Dr. Jastak.

On June 18, 1973, Dr. Olmedo wrote to the Judge stating:

"This is regarding Mr. Russell Maher, who as you know, was operated for multiple intracranial aneurysms on two separate occasions in 1963. He developed a postoperative convulsive disorder for which he has been taking anticonvulsant therapy in the way of Dilantin and Phenobarbital on a regular basis for all of these years. Following his surgery, he also had a left sided weakness, which cleared, except for still some clumsiness of the left upper extremity. He has been also with periodic mental depression and anxiety and nervousness, which further renders him disabled.

His last visit here in the office was on July 18, 1972. At that time I thought it might be advisable for him to have a trial of returning to work to see if this might benefit him in some way. Unfortunately, I was advised that he was unable to continue working and therefore feel that due to the above-mentioned residuals from his intracranial aneurysms he will not be able to engage in any type of gainful employment." (Tr 311).

Dr. Olmedo's medical opinion prior to this letter (*supra* pp. 7–8) consistently held to the view that plaintiff could work in some capacity. Only in this final letter of June 18, 1973, does Dr. Olmedo state that plaintiff is not able to engage in any type of gainful employment. The Judge gave this evidence little weight for the reason that from the context of Dr. Olmedo's letter, it appeared to him that Dr. Olmedo's concluding statement was based upon an assertion by plaintiff that he was "unable to continue working" (Tr 33). Even assuming that this medical judgment was uninfluenced by the advice apparently from the plaintiff himself, the regulations support the Judge's decision. See 20 C.F.R. § 404.1526; footnote 8, *supra*, p. 257.

Plaintiff was also examined by a psychologist, Dr. Jastak. Her report stated that plaintiff has "high average intellectual ability" (Tr 305), but that he has "significant personality deviations" which "appear to be extreme enough in degree so as to interfere with gainful employment on a level to which client has evidently been accusomted (sic) in the past" (Tr 306). It further noted that "[a]lthough test results indicate that client is an intellectually above average and quite capable adult male, psychological impairments appear of significant enough degree to greatly lower his chances of employment over and above those evidently present as a result of his physical condition" (Tr 306). Dr. Jastak could not pinpoint specific vocational areas which plaintiff could pursue because he did not complete the necessary testing. She concluded that "test results do point to client's need for psychotherapy" (Tr 306). Dr. Jastak's reference to plaintiff's failure to complete one of the tests refers to plaintiff's apparent departure from the testing session without advising Dr. Jastak or anyone else of his intention to do so (Tr 303).

■ Plaintiff bore the responsibility of providing the Judge with current medical evidence sufficient to show disability. The Act explicitly outlines this burden in 42 U.S.C. § 423(d)(5):

"An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."

Plaintiff refused to undergo any further medical examination and so indicated to the Disability Determinations Service in Wilmington in May, 1973 (Tr 308–309). As a result, the Judge wrote to plaintiff on June 1 and June 6, 1973, informing him that further medi-

cal examination was advisable (Tr 312–315). The Judge quoted the applicable regulations in his letters which state that a refusal to be present for any examination or test unless there is good cause shown shall be a basis for determining that an individual is not under a disability.[11] The Judge stated that if plaintiff changed his mind and wished to go forward with further examinations to indicate this desire by letter within 10 days. If no such letter was received by the Judge he stated that he would have to issue a decision based upon the record as it then existed.

Plaintiff replied to the June 1, 1973 letter [12] from the Judge in a letter dated June 4, 1973. Plaintiff stated:

> "You have not given me *reasonable*, just or proper cause as to why I should submit myself to the senseless and redundant testing by high priced MDs . . . ." (Tr 316).

Plaintiff's refusals to undergo further medical evaluation and his failure to complete testing with Dr. Jastak frustrated the Judge's attempts to update the medical evidence of record. By his own actions, plaintiff withheld evidence highly relevant to the question of termination of benefits.[13]

Finally, the Judge's finding that plaintiff's benefits ended on August 31, 1972, is in accordance with the Act. 42 U.S.C., §§ 416(i)(2)(D), 423(a).

■ Upon a review of all the evidence, significant portions of which have been detailed herein, this Court concludes that the decision of the Judge

---

11. 20 C.F.R. §§ 404.1527, 404.1528.

12. The record contains no reply from plaintiff to the Judge's letter of June 6, 1973.

13. For example, plaintiff asserts that:
> "No doubt, my decision to attempt a work return at any SGA [substantial gainful activity] was a classic manifestation of the impaired judgement (sic) generally associated with victims of brain injury such as mine."

No medical opinion specifically supports the conclusion reached by plaintiff although Dr. Jastak, *infra*, concluded that plaintiff in gen-

---

was based upon substantial evidence. The specific findings of the Judge, noted *supra*, are fully supported by the record and the Act.

It is therefore ordered that the decision of the Judge be affirmed and the motion of the defendant for summary judgment be granted.

eral suffered from impaired judgment (Tr 306). Full cooperation by plaintiff might have adduced medical support for his theory. Similarly, in the absence of supporting medical evidence, plaintiff's contention that his health caused him to discontinue working as an electrician for the two corporations does not bring his application within 20 C.F.R. § 404.1534(a) which provides:
> "[w]here an individual is forced to discontinue his work activities after a short time because his impairment precludes continuing such activities, his earnings would not demonstrate ability to engage in substantial gainful activity."