David SEARS, Plaintiff–Appellant,

v.

Otis R. BOWEN, Secretary of Health and Human Services, Defendant–Appellee.

No. 87–1382.

United States Court of Appeals, Seventh Circuit.

Submitted Sept. 23, 1987.[*]

Decided Jan. 22, 1988.

As Amended Jan. 26, 1988.

---

\* After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement

as to Need of Oral Argument." *See* Rule 34(a), Fed.R.App.P.; Circuit Rule 34(f). No such statement having been filed, the appeal has been submitted on the briefs and record.

David Dreis, Legal Action of Wisconsin, Inc., Milwaukee, Wis., for plaintiff-appellant.

Patricia J. Gorence, U.S. Atty., James L. Santelle, Asst. U.S. Atty., Milwaukee, Wis., Ted K. Yasuda, Asst. Reg. Counsel, Office of Gen. Counsel, Dept. of Health & Human Service, Chicago, Ill., for defendant-appellee.

Before WOOD, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

David Sears appeals the district court's order upholding the final determination of the Secretary of Health and Human Services that he is not disabled and denying a remand to the Secretary to consider additional evidence. We reverse the district court's order in part and remand this case to the Secretary.

## A. Background

### 1. Prior Proceedings

This is a difficult case. A review of its procedural background is necessary. David Sears suffers from glaucoma. He applied for benefits claiming to have been disabled as a result of the glaucoma and its effects. After Sears' application was denied on two separate occasions at the administrative level, he requested and received a hearing before an Administrative Law Judge in September 1984. He was represented at the hearing by a lay advocate. At the close of the hearing, the ALJ agreed with the advocate's request to keep the record open in order that an additional report from a Dr. Ridley might be considered when filed.

Dr. Ridley's report was never filed. Another extension of time was granted, and the ALJ subsequently wrote to another lay advocate assigned to Sears' case (a different advocate from the same organization) reminding him that the extension of time had expired and giving him an additional ten days to file the evidence. A copy of the letter was sent to Sears, but Sears' vision is so poor that he is unable to read even ordinary type.

In April 1985, the ALJ denied benefits finding that Sears' glaucoma was a severe impairment, but that he was able to do light work if he was not exposed to bright light and was also free of undue stress. The ALJ also found Sears was able to perform his past relevant work as a teacher's aide.

Sears sought review before the Appeals Council. He filed a form statement with the Appeals Council requesting that they attempt to obtain additional medical (psychiatric) evidence from a Dr. Ulrich, who had begun treating him for "nerves" (biweekly since October 1984 and weekly since February 1985) after the hearing before the ALJ. The statement also informed the Appeals Council that Dr. Ulrich had prescribed an unspecified medicine which Sears ingested two times per day. The Appeals Council sent Sears a letter informing him that he bore the burden of submitting additional reports. A copy of that letter was forwarded to his advocate, but no report from Dr. Ulrich was ever submitted. On September 20, 1985, the Appeals Council denied review, concluding that the ALJ had neither abused his discretion nor committed an error of law, and that the ALJ's conclusions were supported by substantial evidence. A report from Dr. Baliff, an opthamologist, on the status of Sears' glaucoma that was apparently to

have been submitted to the ALJ [1] was then submitted to the Appeals Council. The Council ruled that the information contained in the report had previously been considered and affirmed its prior decision.

At this time Sears obtained counsel rather than a lay advocate; his attorney requested an extension of time from the Appeals Council to appeal its decision to the district court. The request was attached to an affidavit from Sears stating that he had been represented by three different advocates from the same office during the course of the proceedings; he did not understand the difference between an appeal to the Appeals Council and one to a federal court or the timing requirements for appeals, but believed that the advocates were handling his appeal; he thought that he had been granted an extension of time to appeal based both on new evidence to be submitted following additional eye surgery and on unspecified evidence which had been previously submitted; and, because of his visual impairment, he explained that he relied on others (his advocates) to read and interpret the notices he received from the Secretary. When the Appeals Council granted the request for the extension of time to appeal, Sears filed suit in the district court. The court granted summary judgment to the Secretary and further denied Sears' request for a remand to consider the contents of Dr. Ulrich's report. This appeal followed.

## 2. Dr. Ulrich's Report

Dr. Ulrich filed a psychiatric report dated July 2, 1986, some ten months after the Appeals Council decision of September 20, 1985 which denied review. The report reveals that in addition to glaucoma, Sears suffers from a myriad of serious and chronic psychiatric problems which cast significant doubt on his ability to work. In the report, Dr. Ulrich details Sears' mental impairments and concludes that Sears is unable to work and is totally disabled as a result of the "severity of his current symptoms and the profundity of their origins." Dr. Ulrich's clinical findings state that Sears suffers from a "severe dysthymic disorder," including low self-esteem, intense emotional conflict, poor concentration, obsessional thought patterns, and marked anxiety combined with "persecutory ideation" and reclusive behavior.

Dr. Ulrich's report also reviews Sears' familial, medical, and placement history, the majority of which had not been presented to the ALJ. In addition to Dr. Ulrich's opinion that Sears is disabled due to the severity of his current symptoms, the report also contains a wealth of case history information about Sears. For example, it states that Sears lived in a children's home from ages 3-6, experienced physical and sexual abuse from relatives, was misdiagnosed as "mentally deficient," and was improperly institutionalized from ages 13-22, during which time he was frequently beaten and kept in isolation for long periods of time. Dr. Ulrich also reports that Sears has a "dull-normal" I.Q. of about 79 and that his reading and math skills are at the third grade level.[2] The report also reflects that Sears was the victim of a near-fatal mugging/stabbing in 1977. Sears' prognosis is listed as "guarded" due to his severe symptoms, the chronic nature and severity of his psychiatric problems, and the very nature of his developmental deprivations. The report indicates that Sears' impairment has lasted or is expected to last twelve months. This information was neither presented to the ALJ nor to the Appeals Council. It is this report which Sears seeks to have the Secretary consider.

## B. Discussion

On appeal Sears argues that the district court erred in failing to remand the case to the Secretary for consideration of Dr. Ulrich's psychiatric report. Sears also contends that the Secretary's conclusion that

---

1. The report was not from Dr. Ridley as indicated at the hearing. It was prepared by Dr. Baliff, Sears' treating physician.

2. At the hearing before the ALJ, Sears testified he had gone to school until the 11th grade, he knew how to read, and he could do simple math such as adding, subtracting, multiplying, and dividing. Record at 42-43.

his glaucoma is not disabling is not supported in the record with substantial evidence and that the Secretary denied him a fair hearing.

### 1. SUBSTANTIAL EVIDENCE

Sears argues that the ALJ's conclusion that he is not disabled on the basis of his glaucoma is not supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) [quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 126 (1938) ] *quoted in Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir.1986), taking into account "whatever in the record fairly detracts from its weight." *Id.*

■ In his attack on the substantiality of the evidence, Sears raises two claims. Initially, he argues that the ALJ's conclusion that his vision is correctable to within "normal limits" is not supported in the record with substantial evidence. There is no dispute that Sears does not meet the regulatory definition of blindness (vision in the better eye correctable to no better than 20/200, 20 C.F.R., Subpart P, Appendix 1, § 2.02). The record supports Sears' belief that he is statutorily blind in his right eye. All but one [3] of the medical reports agree his vision in that eye cannot be corrected to better than 20/200. However, the record also supports the Secretary's conclusion that Sears' vision in his left eye is correctable to better than 20/200. All but one of the medical reports show that the vision in Sears' left eye may be corrected to about 20/20. The exception is the report of Dr. Baliff, which shows that Sears' left eye may be correctable only to about 20/80, described as "moderately myopic." [4] Dr.

Baliff did not conclude that Sears was disabled but acknowledged that Sears had a "significant impairment," which is consistent with the Secretary's finding that Sears' impairment was severe. No doctor has suggested that Sears is disabled as a result of his poor vision (even combined with his headaches brought on by bright light and/or stress). Sears' visual impairments are long-standing and he wore prescription eyeglasses at the hearing before the ALJ; in spite of this handicap, he has worked in the past. We conclude that there is substantial evidence in the record to support the conclusion that Sears' visual impairment, which is correctable to some degree, when considered in isolation from his other problems, fails to render him disabled within the meaning of the applicable regulations. *See* 20 C.F.R. § 2.02; 20 C.F.R. § 404.1581 ("statutory blindness" is "central visual acuity of 20/200 or less in the better eye with the use of a correcting lens"). *See also* 20 C.F.R. § 416.985 (visual impairments which do not meet definition of statutory blindness are evaluated as any other impairment); Social Security Ruling 85-15 (PPS-119: Capability To Do Other Work—The Medical–Vocational Rules As A Framework For Evaluating Solely Nonexertional Impairments) (stating visual impairments are nonexertional and "as long as [a claimant] retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in the workplace), there would be a substantial number of jobs remaining across all exertional levels.").

■ Second, Sears challenges the Secretary's conclusion that the headaches he experiences as a result of his glaucoma can be controlled with medication. Much of Sears' arguments on appeal on this point deal with what Sears characterizes as a finding that he has refused treatment for

---

**3.** One report concluded that Sears' right eye could be corrected to 20/100. On the basis of this report (one of seven), two doctors concluded Sears was not disabled. The ALJ did not expressly rely on those conclusions.

**4.** Dr. Baliff's report was submitted to the Appeals Council but not the ALJ, which accounts

for the ALJ's failure to discuss it. The Appeals Council considered the report and noted that the vision in Sears' left eye was variously reported as correctable to within 20/20—20/50 and that he has had poor vision all of his life, thus the information was already of record.

his headaches. We do not agree with Sears' interpretation of the ALJ's decision; the ALJ merely states that one medical report reflects that Sears has had some history of noncompliance. Nothing in the decision suggests that the ALJ was invoking the regulations under which a claimant who suffers from a severe impairment may be found not disabled because he refuses to undergo treatment. *See* 20 C.F.R. §§ 404.-1530, 416.930. To the contrary, the ALJ found that Sears suffered from a severe impairment as a result of his glaucomatic condition, but retained the capacity to do a range of light work if he was not exposed to excessive light or undue stress (possible causes of his headaches). Sears does not refute the ALJ's finding that he does not suffer from disabling pain and his daily activities support these conclusions. We are mindful of Sears' testimony that one of the reasons his household activities were fairly normal was because he was familiar with his surroundings, thus enabling him to adjust to and work around his visual impairments. Nonetheless, the ALJ found that Sears would be able to do his past relevant work as a teacher's aide.

The burden was on Sears at that point, *Bauzo*, 803 F.2d at 920 n. 1, to demonstrate that he was unable to perform in the capacity of a teacher's aide because of his glaucoma. From our review of the record we are convinced that there is substantial evidence contained therein supporting the Secretary's decision.

2. REMAND

■ A court may remand a case to the Secretary to consider additional evidence if the evidence is new, material, and there is good cause for not introducing it during the administrative proceedings. 42 U.S.C. § 405(g);[5] *Waite v. Bowen*, 819 F.2d 1356, 1361 (7th Cir.1987) (citing *Bauzo*, 803 F.2d at 926). Upon review we are satisfied that Dr. Ulrich's psychiatric report meets this test and that Sears has demonstrated good cause for his failure to submit it to the ALJ

and Appeals Council. We therefore order this case remanded to the Secretary for consideration of Dr. Ulrich's psychiatric report.

a. NEWNESS

■ The evidence contained in the psychiatric report is new; it was not in existence at the time of the administrative proceedings. *Cf. Evangelista v. Secretary of Health and Human Services*, 826 F.2d 136 (1st Cir.1987) [information must be neither cumulative nor irrelevant to be new under § 405(g) ]; *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir.1987) (where claimant alleged disability due to numbness in legs, evidence of psychological problems new because produced by only comprehensive psychological evaluation performed); *Bauzo*, 803 F.2d at 926.

b. GOOD CAUSE

We believe Sears has demonstrated good cause for not incorporating Dr. Ulrich's report into the record during the administrative proceedings. The report itself did not exist until after the Appeals Council had denied his claim. *Milano, supra; Cherry v. Heckler*, 760 F.2d 1186, 1192 (11th Cir.1985); *Bauzo, supra; Burton v. Heckler*, 724 F.2d 1415, 1418 (9th Cir.1984). Although some cases have placed weight on the fact that the claimant knew of his mental impairments earlier, *see Allen v. Secretary of Health and Human Services*, 726 F.2d 1470, 1473 (9th Cir.1984); *Oliver v. Secretary of Health and Human Services*, 804 F.2d 964, 966 (6th Cir.1986); *Willis v. Secretary of Health and Human Services*, 727 F.2d 551 (6th Cir.1984) (*per curiam* ), we note that Sears did not begin seeing Dr. Ulrich until October 1984, after his hearing before the ALJ, and did not commence to visit him on a weekly basis until February 1985. Moreover, Dr. Ulrich was treating Sears; it is evident from the record that he was not an expert retained solely for the purpose of establishing a

---

**5.** Section 405(g) provides in part:

The court ... may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new

evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

disability. Furthermore, in his statement to the Appeals Council, Sears did call attention to his treatment by Dr. Ulrich, albeit in lay terms. (It is probably the unusual patient who would be able to relate the details of chronic psychiatric problems in the depth required to establish the existence of a severe psychiatric impairment.) This record and these facts convince us that this is not a case of "sandbagging" by a claimant who loses and hopes to get another chance at obtaining benefits by bringing in new evidence. This case thus contrasts with *Evangelista,* where the court found "[t]he inference is inescapable that appellant's counsel retained [the medical expert] to evaluate the case," 826 F.2d at 139, and *Allen,* where the court concluded the "obvious explanation" was that Allen sought out new expert witnesses who might give support to his disability claim after he was unsuccessful in the agency and district court hearings, 726 F.2d at 1473. *See also Willis,* 727 F.2d 551; *Milano,* 809 F.2d at 766; *Booz v. Secretary of Health and Human Services,* 734 F.2d 1378, 1380 (9th Cir.1984). It is also evident that Sears is uninformed in procedural matters, *cf. Veal v. Bowen,* 833 F.2d 693, 700 (7th Cir.1987); *Waite v. Bowen,* 819 F.2d at 1361–62; his affidavit requesting an extension of time to file his appeal indicates he believed that he already had an extension, that some evidence had already been submitted, and that he would be able to submit more evidence following additional eye surgery. Moreover, Sears was represented by lay advocates, rather than legal counsel, whose endeavors obviously left much to be desired. While this fact, standing alone, is not dispositive, *Evangelista,* 826 F.2d at 142, when combined with his psychiatric history and problems, the nature of Sears' visual impairments, his reliance on others to read and explain letters and notices to him, and the other facts and circumstances surrounding this case, it certainly weighs in favor of finding good cause. Finally, based on Sears' affidavit, the Appeals Council found good cause pursuant to its regulations to grant him an extension of time to file his appeal. *See* 20 C.F.R. §§ 404.982 and 404.911 (listing examples of good cause for failure to timely file action for review in federal court). Again, while not dispositive, the fact that the Appeals Council found good cause existed for Sears' failure to timely file an appeal under these circumstances lends support to our conclusion that there was good cause for Sears' failure to present this evidence below. *Milano,* 809 F.2d at 766 (§ 405(g)'s good cause requirement reflects congressional intent to prevent bad faith manipulation of the administrative process).

### c. MATERIALITY

Evidence is material if there is a reasonable possibility that it would have changed the outcome of the Secretary's determination. *Booz,* 734 F.2d at 1380; *Borders v. Heckler,* 777 F.2d 954, 956 (4th Cir.1985). We review such determinations *de novo. Booz, supra* at 1381; *Cherry,* 760 F.2d at 1194; *Milano,* 809 F.2d at 766.

The district court found Dr. Ulrich's report inconsistent with the other evidence because it characterized Sears' mental impairments as long-standing, even though he had been gainfully employed in the past. We see no inconsistency. Many people with psychiatric problems have doubtless been able to maintain gainful employment for periods of time. We note also that the doctor properly confined his opinion, findings, and conclusion as to the ultimate issue of disability to Sears' then-current symptoms. It is not inconsistent, particularly when considering mental impairments, that a claimant might have periods of psychiatric episode, as well as periods of remission, yet still be classified as disabled under the governing regulations. This explains Sears' behavior at the hearing before the ALJ; he apparently did not manifest any overt symptoms of a psychiatric disorder at that time. Nothing in the record indicates that Sears was ingesting any medication, other than that prescribed for his glaucoma, at the time of the hearing. Thus we also reject the Secretary's claim that Dr. Ulrich's report is not credible because Sears did not testify to, nor did the ALJ's observations on the record recount, that Sears suffers from the symptoms in-

ventoried in the report: sleep disorder, panic, night terrors, handwringing, frequent tearfulness, and self-derogation. It would not be unusual for one with serious psychiatric problems to have difficulty detailing his symptoms and recounting his medical history. This also explains the doctor's July 1986 report that weight loss was a "secondary feature" of Sears' impairment, even though at his September 1984 hearing Sears testified that he had not lost weight. As to his previous employment, Sears last gainful employment was in 1980; thus it is very possible that his psychiatric problems became disabling, if they did, some time after that.

Dr. Ulrich's report of July 1986 is based on his treatment of Sears beginning October 1984 as well as his review of the relevant records. One initial problem, which the Secretary has not addressed, is that although the report is obviously highly probative on the issue of Sears' mental impairments as of the date of the report, it reveals very little, if anything, of his condition during the time period at issue in the disability determination proceedings. Sears applied for benefits in 1983 alleging that he was disabled as of March 1980. According to the ALJ, Sears was last eligible for disability benefits on March 31, 1984, and his disability had to have begun on or before that date in order for him to be entitled to benefits. Consequently, the disability inquiry must focus on the status of Sears' mental impairments on or before March 31, 1984. *Evangelista*, 826 F.2d at 138, and 140 n. 3; *Booz*, 734 F.2d at 1380. While it is true that Dr. Ulrich's report details severe and chronic psychiatric problems, it does not indicate that Sears was *disabled* during the relevant time period. *See Oliver*, 804 F.2d at 966 (report compiled in March 1985 not material because it does not reveal information about claimant's condition in December 1983, when Secretary decided); *cf. Booz*, 734 F.2d at 1381 (1981 report concluding claimant disabled in 1975, when his eligibility for benefits expired, material). The fact that the

doctor stated that the impairment had lasted or was likely to last 12 months is of little import because the statement was made more than a year after the administrative hearing. Indeed, the doctor's conclusions are qualified to encompass Sears' then-present status. For example, Dr. Ulrich concluded only that Sears was disabled *"at the present time* due to the severity of his *current* symptoms."* (Emphasis added.)

We believe it is very probable that Sears may be able, with the aid of competent counsel, to gather evidence which would establish the severity of those impairments for the relevant time periods. *Cf. Booz*, 734 F.2d at 1381. Presumably he could then file a second application for benefits based on his mental impairments or request that the Secretary reopen his case in hopes of revising his original determination. *See* 20 C.F.R. § 404.987 (requiring good cause) and § 404.989 (defining good cause as the furnishing of "new and material" evidence). *See also* 20 C.F.R. § 404.995 (discussing finality of findings of fact where two claims for benefits filed on same earnings record). We nonetheless conclude that a remand under § 405(g) is warranted based on Dr. Ulrich's comprehensive and enlightening psychiatric report. There is little doubt that Sears' mental impairments are of long standing, even if they may not have been so severe as to render him disabled since 1980. Even if a timing problem exists, we conclude, under the admittedly unusual circumstances of this case, that the combination of long-standing psychiatric problems, which may alone be disabling,[6] and important biographical information about the claimant, none of which was before the Secretary, is material. We hold that a remand under § 405(g) is warranted in this case.

### 3. DEVELOPMENT OF THE RECORD

■ We go on to address Sears' claim that the Secretary failed to fully and fairly develop the record because on remand

---

**6.** Sears maintains that his mental impairments meet the requirements of the mental disorders described in §§ 12.02 and 12.06 of the Secretary's Listing of Impairments, *see* 20 C.F.R. Part 404, Subpart P, Appendix 1, and would result in a finding of disability.

Sears may wish to present evidence in addition to Dr. Ulrich's report. There is no dispute that the Secretary has a duty to fully and fairly develop the record. We are particularly concerned with Sears' claim because it appears that a more detailed case history, including biographical information, should have been presented to the agency, if only because it might have led to the development of other relevant information. Considered individually, the flaws in the administrative proceedings may not be dispositive, but when considered in their entirety, they warrant remand.

First, as previously mentioned, Dr. Ulrich's report contains a detailed social case history, including basic and important biographical information, which is noticeably absent from the administrative record. Certainly had the ALJ or Appeals Council been aware of Sears' chaotic childhood and extensive history of institutionalization, further inquiry into his mental state would not only have been indicated but required.[7]

█ Second, Sears was not represented by counsel, but he had a number of advocates from Wisconsin Community Advocates, whose efforts, as we have stated, lacked continuity. We have said that an ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made his best case. *Glenn v. Secretary of Health and Human Services,* 814 F.2d 387, 391 (7th Cir.1987). This does not necessarily hold true when a claimant is represented by a nonlawyer. In any case, the goals of the Secretary and the advocates should be same: that deserving claimants who apply for benefits receive justice.

We begin by examining the advocate's role at the relatively brief hearing. The transcript is but a mere 29 pages long. The advocate did little [8] beyond requesting that the record be kept open for an additional report on Sears' glaucoma, Record at 33, but that report was not submitted until after the Appeals Council had rendered its decision. *See* Record at 144 (ALJ's letter to an advocate at Community Advocates indicating that despite ALJ's grant of extension of time, evidence not submitted; granting additional extension of time); *id.* at 58 (ALJ closes administrative record); *id.* at 9 (undated report of Dr. Baliff); and *id.* at 8 (Appeals Council's response to report). The advocate did not question Sears at the hearing. *Id.* at 57.

Sears was apparently shuffled between three different lay advocates in the same organization, Record at 6, whose work products leave much to be desired. One of them failed to follow through on a letter from the Appeals Council informing Sears that it was his responsibility to provide the Council with the medical reports from Dr. Ulrich. *See id.* (Sears' affidavit explaining his reliance on advocates to read and explain notices from agency) *and id.* at 12 (letter from Appeals Council telling Sears to provide the report indicating copy sent to advocate at Community Advocates).[9] Sears' psychiatric problems may very well have exacerbated these problems; the record fails to disclose whether Sears ever told the advocates of his prior psychiatric history or if they even inquired.

7. *Compare* Dr. Ulrich's report *with* SSR 85–15, *supra* (emphasis added).
   The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. *A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.* This, in turn, would justify a finding of disability because even favorable age, education, or *work experience* will not offset such a severely limited occupational base.

8. Sears points out that his advocate, Kristin Heintz, was criticized in an unpublished district court opinion in a different case. To the extent she can fairly be criticized, the other advocates who represented him also deserve criticism. *See* discussion *infra*. Whether or not this is a case of incompetence, the fact remains that the advocates did little for Sears, who needed strong and effective representation.

9. As Sears points out in his brief, the copy of this letter appearing in the administrative record, Record at 12, is, in contrast to the other copies, quite poor.

Third, this appears to be a case where the ALJ relied too much on the fact that Sears had an advocate acting on his behalf and failed to affirmatively develop a proper administrative record. As noted, the transcript is 29 pages long; the hearing lasted only 32 minutes. *See* Record at 30 and 58.

At the outset of the hearing, in what appears to have been a boilerplate prepared statement, the ALJ stated, "I will also take evidence on and consider any mental, skin, sensory or environmental impairment that might also somehow limit your capacity to engage in substantial gainful work activity." Record at 36. Aside from eliciting that bright lights bothered Sears' eyes (he wore tinted glasses at the hearing, *id.* at 44), and that he experienced headaches caused by stress and pressure in his eyes from the glaucoma, *id.* at 45, 51, 52, 53, the ALJ did not initiate any further inquiries.

Another example is the ALJ's conclusion that Sears might continue in his past relevant work as a teacher's aide, apparently based only on the following discussion [10] with Sears, which, in our opinion, was too limited in scope and breadth to make a well-reasoned judgment and finding:

[ALJ]: You were a teacher's aid? [sic]
[Sears]: Yes.
Q: In a handicapped—for handicapped trainer?
A: Yes.
Q: And where was this?
A: This was on Lars—through the vocational service.
Q: I see. And what type of work did you do there?
A: Well, take kids down and walk. Help them with different—we gave my job to like stringing things and something more or less jus [sic] to keep 'em busy.
Q: Was this a full time job?

A: Yes.
Q: And you left that job—why?
A: Money.

Record at 40–41.

While recognizing that statements made by a claimant are generally sufficient for determining the level of skill and demands of past relevant work, the Secretary has also recognized that a claimant's ability to do past relevant work may be "a controlling issue, [therefore] every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." SSR 82–62 (PPS–80: A Disability Claimant's Capacity To Do Past Relevant Work, In General). *See also* SSR 86–8 (PPS–123: The Sequential Evaluation Process) ("Past work experience should be considered carefully to assure that the available facts support conclusions regarding the claimant's ability or inability to perform this work."). Obviously, even greater care and diligence is required and greater effort must be expended when obtaining relevant information from a claimant who suffers from psychiatric problems. Our review of the record has uncovered no other information describing Sears' employment history as a teacher's aide apart from Exhibits 10 and 18, Record at 94 and 140, which merely list the teacher's aide job and indicate that Sears' employer was the "Jewish Vocational Service," he was employed from March 1974 through October 1977 (one document apparently incorrectly lists the dates as 1964–1967), and was paid $3.50 per hour.

The ALJ was also aware that Sears had served a term of imprisonment at Wisconsin's Waupun Correctional Institute. Record at 40, 55. Nothing in the record indicates what the sentence was for.[11]

---

10. Although Sears' response here is quite incoherent, his answer is not representative of his other testimony at the hearing before the ALJ.

11. Sears' prison record and history of sexual and physical abuse as a child do not appear to be relevant to the conclusion that he is capable of doing his past relevant work as a teacher's aide (except to the extent that his prior abuse created an impairment which might preclude him from doing that type of work). The regula-

tions state that *"Your impairment must prevent you* from doing past relevant work.... If you can still do this kind of work, we will find that you are not disabled." 20 C.F.R. §§ 404.1520(e) and 416.920(e) *quoted in* SSR 82–61 (PPS–72: Past Relevant Work—The Particular Job Or The Occupation As Generally Performed) (emphasis altered).

There was also evidence of record that Sears lived in an unspecified type of halfway house after his release from prison; whether this was in connection with his release from prison or not is unclear. *Id.* at 66–67 and 92. The record discloses that the ALJ failed to make any inquiries into his past living arrangements, but only inquired as to his then-current address. *Id.* at 37.

In addition, from a medical point-of-view, Sears' testimony of the side effects he experienced from his medication should have triggered not only an inquiry by his lay advocate, but at least a more in-depth inquiry by the ALJ. For example, Sears testified that "I feel already a bad probelem [sic] and it's made even worse by taking my medicine, but I have to take my medicine 'cause my doctor said so. But sometimes I wish I hadn't because of the feelings that I get. They're so odd. They're unusual and I can't cope with them." Record at 48. When the ALJ asked what he did to relieve his headaches, Sears replied, "Sometimes I just ride 'em out and then sometimes I overdose myself. And then when I do that it's, you know, it's a powerful feeling, you know. But you do anything when you come to that point where your head hurts so much where you can't look at people." *Id.* at 52–53.

Sears also testified to a somewhat limited lifestyle even though his day-to-day activities appear to be rather normal. For example, he helps his cousin who is disabled; he does some housework; he carries things at the grocery store for his cousin; he assists her invalid mother; and he plays with the eight-year-old boy for whom his cousin cares. Record at 49–52. He did not testify about his social life, nor did the ALJ inquire. When asked whether he had any hobbies, he indicated he listened to music. *Id.* According to Dr. Ulrich's report, Sears evinces reclusive behavior in all social settings including those with family and friends. As the Secretary has noted, "Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well." SSR 85–15. Whether this testimony, when considered in combination with the other

evidence, required the ALJ to inquire further remains a problem. We have kept in mind that the burden is on the claimant, Sears, to establish a severe impairment or combination of impairments which prevent him from returning to his past relevant work and that as a court reviewing the record as well as Dr. Ulrich's report, we benefit from hindsight.

In sum, no single factor, when considered in isolation, appears to mandate reversal. Rather, it is the unfortunate confluence of a number of different factors, some minor, and including the very impairments themselves, which resulted in Sears' mental impairments not being considered by the ALJ or the Appeals Council. Perhaps the single most disturbing factor is that one with a tragic and chaotic case history like that of David Sears, including an extensive period of institutionalization, can go through the entire administrative process without a shred of evidence about that troubled background being elicited or appearing in the administrative record. For these reasons, we conclude that the record below was inadequate and neither properly nor fairly developed.

## C. CONCLUSION

The combination of Sears' mental impairments, his background, his lack of adequate assistance in the proceedings before the agency, his inability to read notices from the agency and reliance on others to explain them to him, his lack of understanding of the administrative process, and the failure of the ALJ to inquire into his troubled background compel us to conclude that this case must be remanded to the Secretary for further proceedings.

Affirmed in part and reversed and remanded in part.