**Loren RANSOM, Plaintiff–Appellant,**

v.

**Otis R. BOWEN, M.D.,\* Secretary of Health and Human Services, Defendant–Appellee.**

No. 85–3138.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 16, 1987.

Decided April 26, 1988.

---

\* Otis R. Bowen succeeded Margaret M. Heckler as Secretary of Health and Human Services on December 13, 1985. Pursuant to Fed.R.App.P. 43(c)(1), Otis R. Bowen has been substituted for Margaret M. Heckler as the defendant in this suit. No further action is required to continue the suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. 405(g).

G. Beth Packert, Jenner & Block, Chicago, Ill., for appellant.

Laurence Gilbert, Asst. Regional Atty., Dept. of Health & Human Services, Chicago, Ill., for appellee.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff-appellant Loren Ransom appeals the district court's order upholding a final decision of the Secretary of Health and Human Services that his disability insurance benefits were properly calculated. We affirm in part, reverse in part, and remand to the Secretary.

I

A. *Background*

Mr. Ransom has suffered from paranoid schizophrenia since childhood. For most of his life, Ransom's mental illness has prevented him from being gainfully employed, and his earnings from his birth in November of 1923 through 1970 were only $6,189.04, with the majority of this income reflected during an eight-year period from the years 1957 through 1964. During the 12–year period from 1945 to 1957, Ransom was confined in a state mental institution. Thereafter, Ransom was employed on an irregular basis until 1965, when he suffered an exacerbation of his mental illness, thereby preventing him from continuing work. In mid–1971, Ransom's mental problems were in remission and thus allowed him to return to work and be gainfully employed alternatively as a maintenance man, fireman, and watchman. From the date of his initial employment to August of 1982, his reported accumulated earnings were $158,058.37. At this time, in August of 1982, his serious mental problems re-

turned, and he was unable to work. He has remained unemployable since that date.

B. *Ransom's First Application for Disability Insurance Benefits*

In 1965, at the age of 42, Ransom applied for child's disability benefits based on his father's employment record pursuant to § 202 of the Social Security Act, 42 U.S.C. § 402(d), claiming that he was disabled as a result of mental illness. The SSA denied his claim for benefits on the ground that he was not "under a disability which began before he [or she] attained the age of eighteen."[1] 42 U.S.C. § 402(d)(1). Ransom sought review of this ruling, arguing that for a number of years his claim was held up in the administrative process until its ultimate denial by the Secretary. After the Secretary's denial of his claim, Ransom sought district court review of the Secretary's determination. In 1972, Judge Gordon of the Eastern District of Wisconsin, after reviewing the administrative record, issued an order reversing the Secretary's benefit denial, finding that Ransom was eligible to receive child disability benefits for the period 1941 through mid–1971 based on his father's earnings record.

C. *Ransom's Second Application*

In August of 1982, Ransom's paranoid schizophrenic condition became debilitating to such a degree that he was unable to continue gainful employment. He once again applied for disability insurance benefits, this time based on his own personal work record (rather than his father's earnings record). The SSA determined that: (1) Ransom was disabled as a result of paranoid schizophrenia as of July 10, 1982; and (2) he was eligible to receive disability insurance benefits based on his personal work record pursuant to § 223 of the Social Security Act, 42 U.S.C. § 423 (1982).

---

1. In 1972, Congress raised the age for child's insurance benefits from eighteen to twenty-two. Pub.L. No. 92–603, § 108(a), 86 Stat. 1329, 1343 (effective Jan. 1, 1973). Under the current law, an individual who is "under a disability which began before he [or she] attained the age of 22" is entitled to child's disability benefits under the SSA if the *parent's* earnings record would quali-

fy the parent as being eligible for a classification of "fully insured" status as the term is defined in the Act. 42 U.S.C. § 402(d). An adult with his or her own earnings record may receive disability benefits if that earnings record would qualify the adult for "fully insured" status. 42 U.S.C. § 416(i).

Ransom's disability benefits commenced in March of 1983 with payments of $371 per month. Ransom thereafter wrote to the SSA protesting the calculations of his benefits, stating that he believed the SSA's benefit calculations failed to include his 1982 wages earned to the date of his illness. On July 6, 1983, the SSA replied, noting that his 1982 wages had been included in the original computation of benefits. After receiving this information, Ransom sent another letter formally protesting the calculations and requesting reconsideration of the SSA's determination of the amount of benefits due.

The SSA responded with a detailed recitation of his benefit award, explaining that the benefits payable to a disability benefit claimant are premised on the individual's past average monthly earnings between 1951 (the key date for all SSA claimants) and the year of disability. *See infra* note 4. The SSA further explained that because the SSA had included all the years from 1951 through 1982 (including the time period Ransom had been adjudicated disabled) in computing Ransom's average monthly earnings, his benefits were low in comparison to those received by most other Social Security recipients (who had income during those years). Disagreeing with this letter of explanation, Ransom requested, and was granted, an administrative hearing before an Administrative Law Judge (ALJ).[2]

D. *The ALJ's Decision*

At Ransom's hearing, after the ALJ determined that Ransom's challenge went to the calculation of his disability benefits, he asked Ransom whether he disagreed with the computations used to calculate his benefits, as reflected in the SSA documents. Initially, Ransom replied "yes," but qualified his answer by stating that "I'm not a mathematician," and finally stated, "I don't believe that they're correct." The ALJ then explained that the SSA's reduction in Ransom's benefits was the result of his poor work record prior to 1972. Attempting to question this explanation, Mr. Ransom stated that he felt his benefits should be based:

"on the quarters that were available for computations, not something that where a person, supposing I walked in, *I was even, I'd been in court, but I had been declared disabled before 1982.*

*I've been, in 1970 or '71 I had been declared disabled, but all those years prior to that, I had been determined disabled.*

So, when I got out of the hospital on parole in 1971, and I went to work and I thought maybe I could help myself and maybe, you know, and stay out of these institutions, they told me then, they said, 'Well, if you feel that you can't work anymore.' I went right down to the Social Security Office and told them, I said, 'Forget my, forget sending me anymore money because I'm going to, I've got a job.' They said, 'Okay, if you feel that you're disabled again, all you'll need is a doctor's statement and we'll put you back on disability.' Well, that isn't what happened.

But, anyway I worked all those years and but, I had, you, you say I don't have a record, a work record or anything like that, but, according to, *according to the court, I was disabled all those years, which there's very good factual basis for making such a statement.*"

(Emphasis added). In spite of this direct testimony by Ransom that he had: (1) "been in court ... and declared disabled [by a district judge] before 1982" and (2) been "determined disabled [by Judge Gordon] in 1970 or '71," the ALJ made no inquiries into Ransom's extended period of disability (from 1941 to 1971). Rather than exploring the facts underlying Ransom's prior judicial disability determination, the ALJ merely questioned whether his hospitalization prior to 1972 prevented him from performing gainful employment. Ransom answered that his mental problems prevented him from holding a job before 1972.

Later in the hearing, the ALJ questioned Ted Marlier, branch manager of the Mil-

2. The SSA sent Ransom a notice informing him that he had the right to have an attorney at the hearing, but Ransom declined the opportunity to have legal representation.

waukee, Wisconsin, Social Security office, who explained that the amount of monthly benefits awardable to a disabled individual is equal to a percentage of the person's average monthly earnings from 1951 (the key date for all claimants) to the year of disability (indexed to compensate for inflation), excluding the five years when the claimant's income was the lowest. *See infra* note 4. Marlier also testified that he had examined the calculation of Ransom's benefits and concluded that the "arithmetic" contained in those computations was correct.

After Marlier completed his testimony, Ransom once more repeated his disagreement with the SSA's inclusion of the years before 1972 in the benefit calculations, stating:

> "in 1970, I was found to be mentally disabled, even prior to the year, the years of 18, I mean the age of 18, okay, so if that were the case, then you gotta be in error and kinda figure out a work record based on the years prior to 1972.
>
> ... in 1972, from 1972 until last year, I worked steadily.
>
> Okay, prior, and I was, I was still disabled, *the court found me disabled again*."

(Emphasis added). At the conclusion of the hearing, the ALJ asked "You never received social security before last year, did you?" Ransom answered, "No, I didn't." The ALJ, for reasons unexplained in this record, failed to explore the issue of Ransom's disability despite Ransom's testimony minutes before that a court "found me disabled" during the years prior to 1972.[3]

Sometime after the administrative hearing, the ALJ issued a written decision finding that Ransom's benefit calculations were accurate. Without even making any reference to Ransom's testimony concerning a district court's 1972 disability determination the ALJ stated that Ransom "conceded that he was not receiving disability during the time in question," and the only reference in his findings to Ransom's mental problems is that part of Ransom's testimony that he was ill and hospitalized be-

fore 1972. After summarizing Mr. Marlier's testimony, the ALJ concluded that the SSA had "established a prima facie case that the computation derived under the parameters of § 404.201 *et seq.* was proper and correct," and denied Ransom's claim for an adjustment in his benefit payments. Ransom subsequently requested Appeals Council review of the ALJ's decision, and the Appeals Council denied the request, whereupon the ALJ's decision became the final decision of the Secretary.

## E. District Court Proceedings

Following the Secretary's final denial of Ransom's claim, Ransom filed a *pro se* complaint with the district court, seeking review of the Secretary's decision, and alleging that Judge Gordon had found him disabled in his previous challenge to a denial of social security benefits. Ransom later filed a five-page *pro se* brief in the trial court that referred to Judge Gordon's 1972 decision awarding Ransom child's disability benefits (based upon his father's earnings record) and attempted to explain that the Secretary's failure to take Judge Gordon's decision into account resulted in a miscalculation of his benefits.

Responding to Ransom's lawsuit, the Secretary filed a motion for summary affirmance of the ALJ's decision. Pursuant to 28 U.S.C. § 636(b)(1), the district court referred the Secretary's motion to a United States magistrate, who issued a report recommending affirmance of the ALJ's decision. In spite of Ransom's clear reference to Judge Gordon's 1972 decision in his *pro se* brief challenging the ALJ's decision, the magistrate failed to address the decision and instead addressed only Ransom's broad allegations that he could not reasonably be expected to live on his benefits, characterizing Ransom's challenge as "one of fairness." The magistrate, rejecting this broad challenge, found that the benefit computation was proper pursuant to the statutory mandate, and thus the remedy requested must be denied.

---

**3.** The ALJ failed to include Judge Gordon's 1972     decision in the administrative record.

Ransom's objections to the Magistrate's report discussed the general fairness of the social security system and further argued that the calculation of his benefits should not include the period of time he was disabled (1951–71) pursuant to Judge Gordon's disability finding. Ransom stated:

"I felt I had weighed the facts in this case as they included not only my present circumstances as a recipient of Social Security disability but also those conditions that were made apparent in the earlier case (No. 69–C–232), *when the Honorable Judge MYRON GORDON had found me meriting a disability award as being disabled before my 18th birthday?* That this being true, how could the current evaluation and award of social security benefits made by the Social Security Administration embrace a period of nonemployment, where I had all ready been found disabled by the Honorable Judge Gordon, and reckon this time in computation and determination of today's award?"

(Emphasis added). On November 15, 1985, the district court (Judge Warren presiding), reviewed and approved the magistrate's recommendation and granted the Secretary's motion for summary affirmance.

## II

■ Ransom's primary contention on appeal of Judge Warren's affirmance of the Secretary's decision is that because Judge Gordon found Ransom disabled during the period (1941 to 1971), the ALJ erred in including those years (during which Ransom had no income) in the calculation of his benefits.[4] Under the Act, the amount of benefits payable to a claimant is based on a percentage of the individual's average monthly earnings from 1951 to the year of disability, excluding the five years when the claimant's income was the lowest.[5] Since Ransom was disabled and had very meager earnings between 1951 and 1971 (years during which Ransom received child's disability payments), he argues that his average monthly earnings from 1951 to the year of his adult disability (1982) would of necessity be much lower than those of an individual who had been gainfully employed during that entire period. According to the appellant, the SSA's inclusion of

4. Ransom also challenges the inherent fairness of his administrative hearing on the ground that the ALJ failed to conduct a reasonable inquiry into Ransom's testimony that he suffered from a disability prior to 1972. "There is no dispute that the Secretary [through the ALJ] has a duty to fully and fairly develop the record, [and that] the goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice." *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir.1988). When a claimant is both unrepresented *and* suffers from a mental impairment (as in this case), the ALJ's duty to carefully develop the record is even greater. As we stated in *Sears*, "even greater care and diligence is required and greater effort must be expended when obtaining relevant information from a claimant who suffers from psychiatric problems." *Id.* Despite Ransom's repeated attempts to convey the fact that a judge had declared him disabled in 1972, the ALJ, for some unknown reason, failed to inquire into the facts surrounding Ransom's childhood disability. Given Ransom's mental illness, we are convinced that the ALJ failed to perform his duty to fully and fairly develop all the facts material to Ransom's disability prior to 1972. Despite the ALJ's serious omissions, we note that Judge Gordon's 1972 decision is a matter of public record; pursuant to the appellant's request, we take judicial notice of the decision in

order that we might correct any legal error that may have resulted from its absence in the record. *See Green v. Warden, U.S. Penitentiary,* 699 F.2d 364, 367 (7th Cir.), *cert. denied,* 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983).

5. The SSA calculated the amount of Ransom's monthly benefits on the basis of a "percentage of ... [his] average monthly income, indexed to compensate for inflation ('average indexed monthly earnings')." 42 U.S.C. § 415(a)–(b) (1982 & Supp.III 1985); 20 C.F.R. §§ 404.210–212 (1985). In this method, all years beginning in 1951 (or in the year after the claimant became 21 years old), up to the year of disability, are included in calculating the averaged indexed monthly earnings; however, all years partly or wholly within a period of disability are excluded. In addition, the Act allows exclusion of up to five years when the claimant's annual income was lowest. 42 U.S.C. § 415(b)(2) (1982 & Supp.III 1985). *See also* 20 C.F.R. § 404.211 (1985). The Act also provides a formula of percentages to be applied to the averaged indexed monthly earnings to arrive at the amount of benefits; in addition, the benefits are adjusted periodically for cost-of-living increases. 42 U.S.C. §§ 415(a)(1), 415(i) (1982 & Supp.III 1985); 20 C.F.R. §§ 404.212, 404.270–277 (1985).

the years of his childhood disability (1951–1971) in the benefit calculation caused a substantial reduction in his monthly benefit payment in comparison to what he would have received had those years been excluded. Ransom's appeal requires us to determine whether a recipient of child's disability benefits whose period of disability is interrupted by a period of gainful employment is entitled to have the period of childhood disability excluded from the calculation of the claimant's "average monthly earnings."

■ Ransom argues that because of his childhood disability during the years prior to 1972, he is entitled to a "disability freeze" for those years. Also known as a "period of disability" under the Social Security Act, *see Marker v. Finch*, 322 F.Supp. 905 (D.Del.1971), a disability freeze operates to exclude years within a "period of disability" from the computation of the claimant's average monthly earnings if the individual meets the requirements of 42 U.S.C. § 416(i). *See Ray v. Celebrezze*, 340 F.2d 556, 558 (4th Cir.1965); *Teeter v. Flemming*, 270 F.2d 871, 872 (7th Cir. 1959). The purpose of the "disability freeze" is to protect the worker "against the loss of or the reduction in amount of his disability or retirement benefits ... by providing that the period during which he is disabled and therefore likely not to have substantial earnings will not be counted against him in determining either insured status or the amount of benefits." McCormick, *Social Security Claims and Procedures*, 3d ed. § 397. In other words, a period of disability is "simply the freezing of an insured individual's benefit status so that his retirement [or disability] benefit rights are preserved, even though he does not do any more work in an employment covered by Social Security." *Banks v. Celebrezze*, 341 F.2d 801, 803 (6th Cir.1965).

Section 416(i)(3) establishes the following requirements for an individual's entitlement to a statutory "period of disability":

"(A) he [the claimant] would have been *a fully insured individual* (as defined in section 414 of this title) had he attained age 62 and filed application for benefits under section 402(a) of this title on the first day of such quarter; *and*

(b)(i) *he had not less than 20 quarters of coverage during the 40–quarter period which ends with such quarter, or*

(ii) if such quarter ends before he attains (or would attain) age 31, not less than one-half (and not less than 6) of the quarters during the period ending with such quarter and beginning after he attained the age of 21 were quarters of coverage, or (if the number of quarters in such period is less than 12) not less than 6 of the quarters in the 12–quarter period ending with such quarter were quarters of coverage, or

(iii) in the case of an individual (not otherwise insured under clause (i)) who, by reason of clause (ii), had a prior period of disability that began during a period before the quarter in which he or she attained age 31, not less than one-half of the quarters beginning after such individual attained age 21 and ending with such quarter are quarters of coverage, or (if the number of quarters in such period is less than 12) not less than 6 of the quarters in the 12–quarter period ending with such quarter are quarters of coverage;

except that the provision of subparagraph (B) of this paragraph shall not apply in the case of an individual who is blind (within the meaning of 'blindness' as defined in paragraph (1))."

(Emphasis added). Notwithstanding the fact that Ransom met the Act's definition of "disability" prior to 1972 (adjudicated in Judge Gordon's decision), the Secretary maintains that he fails to meet § 416(i)'s mandated "fully insured" [6] requirement because he failed to qualify for that status on the basis of his personal earnings record; thus, he fails to qualify for a "period of disability" (i.e., a disability freeze) during

---

**6.** An individual is "fully insured" under the Act if he or she demonstrates the existence of twenty calendar quarters (5 years) of work during a forty-quarter period (10 years) ending in or af-

ter the quarter in which he was disabled (20/40 requirement)." *Gressley v. Califano*, 609 F.2d 1265, 1266 (7th Cir.1979). *See* 42 U.S.C. § 416(i)(3).

those critical years (1951–1971). In his argument, the Secretary properly points out that the precise terms of the Act provide that an individual is entitled to receive child's disability benefits based on the earnings record and the "insured status" of *a parent* who is "fully insured" as defined in § 416(i). In contrast, an adult may receive disability benefits if that adult meets the "fully insured" requirement on the basis of his or her *personal* earnings record. *See, e.g., Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir.), *cert. denied*, 444 U.S. 952, 100 S.Ct. 428, 62 L.Ed.2d 323 (1979). But, as the parties agree, a former beneficiary of child's disability benefits who has returned to gainful employment has neither "insured status" nor is he or she "fully insured" under § 416(i) until such time as a claimant establishes or fulfills the requirements for a "period of disability" *based upon the claimant's personal earnings record.* 42 C.F.R. § 404.350. The Secretary contends that because Ransom is unable to establish—on the basis of his personal earnings record—that he was "fully insured" between 1951 and 1971, he fails to meet the "insured status" requirement for a "period of disability." Hence, under the Secretary's interpretation of the Act, Ransom is not entitled to have his years of childhood disability excluded from the calculation of his benefits.

Responding to the Secretary's contentions, Ransom asserts that even assuming he is unable to establish a "period of disability" on the basis of his personal work record, Congress would have provided that a recipient of child's disability benefits should qualify for a "disability freeze" where the disabled individual's period of childhood disability is interrupted by a period of gainful employment. According to Ransom, in the more common situation, where the Act specifically provides a freeze, a worker whose period of disability

is interrupted by a period of gainful activity has already established "fully insured" status based on his personal earnings record. Ransom contends that Congress would have not intended that when a claimant originally receives disability benefits on the basis of his *parents'* earnings record, instead of his own, a contradictory result would occur. In either scenario, he argues, the intent of the Act is to allow the individual who overcomes his original disability to exclude his or her period of disability from the benefit calculation.[7]

Ransom urges us to overlook the failure of the drafters of the Act to specifically provide a disability freeze for a recipient of child's disability benefits in light of the overall statutory scheme of the Act and its legislative history. He asserts that the Act and its history clearly reveal that Congress would not have intended to prevent a disabled individual from obtaining a disability freeze merely because he initially received child's disability benefits (based on the individual's parents' earnings record), instead of benefits premised on the claimant's own earnings record. Ransom postulates that had Congress considered the question, it is logical to presume that Congress would have specified that the years covered by a child's disability determination should qualify for a "period of disability." While Ransom's argument may certainly be considered reasonable, we agree with the Secretary's position that in view of the court's limited deferential standard of review of the Secretary's interpretation of the Act, our authority to override his interpretation is restricted.

"When a court reviews an agency's construction of a statute which it administers," *Chevron USA Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), the Supreme Court has held that "a court may

---

7. For instance, Ransom points to these statements in the Senate Report accompanying the passage of the disability freeze provision:

    "[The purpose of the disability freeze is] to protect the benefits rights of workers who become totally disabled. Where a worker who has been regularly employed under the program is prevented from continuing his coverage by reason of total disability, your committee believes that his insured status under the system should be preserved and that the benefit payable upon his retirement or upon his death should not be reduced."
    S.Rep. No. 1987, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Ad.News 3710, 3712.

not substitute its own construction ... for a *reasonable* interpretation made by the administrator of an agency." *Id.* at 844, 104 S.Ct. at 2782 (emphasis added). *See also Lukhard v. Reed,* —— U.S. ——, 107 S.Ct. 1807, 1812 n. 3, 95 L.Ed.2d 328 (1987). *Chevron* outlines the proper method of analyzing the reasonableness of the Secretary's interpretation of sections of the Social Security Act as follows:

"First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. *If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute....* [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."

*Id.,* at 842–44, 104 S.Ct., at 2781–82. (Emphasis added). While we agree with Ransom that "Congress has not directly addressed the precise question," (whether or not a recipient of child disability benefits qualifies for a "period of disability" under the Act),[8] we do not agree that the Secretary's answer to the question in the negative is based on an impermissible construction of the statute.

Contrary to Ransom's assertion, the text of the Act's legislative history with respect to the disability freeze provision is far from conclusive and fails to support any *single* view of what Congress's intent would have been had it considered the issue; indeed, the legislative history can logically be construed to support positions other than Ransom's. While Ransom's proposal to fill the alleged statutory gap is reasonable, so likewise is the Secretary's. As the Secretary notes, Congress, in passing the disability freeze provision, explained that the freeze was designed in part to "screen out those *who have not established a reasonably substantial attachment to the labor force* and those who have voluntarily retired from gainful activity...." S.Rep. No. 1987, 83rd Cong.2nd Sess. (July 27, 1954), reprinted in 1954 U.S.Code Cong. & Ad. News 3710, 3729. Similarly, when Congress later redefined the insured status requirement for a "period of disability," it stated:

"Under a program which provides protection against loss of earnings on account of disability, *it is reasonable and desirable that there be reliable means of limiting such protection to those persons who have had sufficiently long and sufficiently recent covered employment to indicate that they probably have been dependent upon their earnings.* It was to meet this purpose that the disability work requirements were designed...."

S.Rep. No. 2388, 85th Cong.2nd Sess. (August 14, 1958), reprinted in 1958 U.S.Code Cong. & Ad.News 4218, 4229. Based on these reports from the United States Senate, the Secretary argues, with support in the legislative history, that (quoting from the Secretary's brief):

> apply to the provision of benefits for children disabled prior to age 18. Determination of disability generally would not be difficult because of the *few cases involved.* Most of the cases would be the result of congenital conditions or *conditions existing since early childhood, including mental deficiency."*
> S.Rep. No. 2133, 84th Cong., 2d Sess., *reprinted in* 1956 U.S.Code.Cong. & Ad.News 3877, 3878 (emphasis added).

---

**8.** Congress apparently did not address the question of whether a recipient of child disability benefits should receive a disability freeze because the child's disability program was set up to aid children who were very likely to be disabled for their entire lives and therefore would never be self-supporting. The Senate Report to the 1956 Amendments to the SSA commented: "Your committee does not believe that the serious difficulties involved in providing cash disability benefits for disabled workers ...

"Congress chose to allow a 'period of disability' to workers who had *already* contributed to the Social Security trust fund in order to preserve the value of their [the funds] future benefits. Allowing a period of disability to an individual who does not have that attachment to the labor force at the time 'the period of disability' began would give that individual a 'free ride'.... Congress did not intend that a 'period of disability' would include the adult years [after age 21] into which a childhood disability continued if the individual's childhood disability later ended and he became entitled to benefits on the basis of his own earnings."

(Secretary's brief, at pp. 20, 18).

Even though the parties each interpret the legislative history in their favor, at best the various Congressional reports contain an articulation of general themes as to the overall goals of the Act's detailed and complex statutory provisions. Since Congress has not been presented with the specific problem and thus has not dealt with the precise issue before us, the parties' assumptions about what Congress would or would not have done had it considered the question is of little value and is nothing more than speculation. We believe that either party's attempted proposal to fill the legislative void created by the Congressional enactment in issue must be considered as reasonable in light of the general themes articulated in the Act's legislative history. But in such a case, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. In *Chevron,* the Supreme Court explained that:

"'The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

■ We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations

'has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. See, *e.g., National Broadcasting Co. v. United States,* 319 U.S. 190 [63 S.Ct. 997, 87 L.Ed. 1344]; *Labor Board v. Hearst Publications, Inc.,* 322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170]; *Republic Aviation Corp. v. Labor Board,* 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed. 1372]; *Securities & Exchange Comm'n v. Chenery Corp.,* [332] 322 U.S. 194 [67 S.Ct. 1575, 91 L.Ed. 1995]; *Labor Board v. Seven–Up Bottling Co.,* 344 U.S. 344 [73 S.Ct. 287, 97 L.Ed. 377].

'... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' *United States v. Shimer,* 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908 (1961). *Accord Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699–700, 104 S.Ct. 2694, 2700–01, 81 L.Ed.2d 580 (1984)."

467 U.S. at 843–45, 104 S.Ct. at 2781–83 (footnotes omitted). In *Watkins v. Blinzinger*, 789 F.2d 474 (7th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987), this court restated these well-settled principles in a case upholding the Secretary's treatment of personal injury awards as "income" for the purpose of determining a family's entitlement to AFDC benefits:

"To the extent the definition of income is a matter of logic, there is support for either treatment. When there is support for either treatment, the decision of the Secretary and the states must prevail. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 461–62, 465, 88 L.Ed.2d 419 (1985); *Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 105 S.Ct. 1102, 1108, 1112, 84 L.Ed.2d 90 (1985); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 423, 103 S.Ct. 1921, 1933, 76 L.Ed.2d 22 (1983) (if the interpretation is 'a reasonable interpretation of the relevant provisions' it must be sustained). *The Secretary has a general power of superintendence, and his treatment should be accepted unless beyond the pale of reasonableness.*"

789 F.2d at 478 (emphasis added). *Cf. Simmons v. Interstate Commerce Commission*, 808 F.2d 22, 23 (7th Cir.1986) (ICC's interpretation of railroad regulations entitled to deference). In the case at bar, Congress did not clearly elucidate a specific intent as to whether a recipient of child's disability benefits whose period of disability is interrupted by a period of gainful employment should qualify for a statutory "disability freeze." Because the Secretary's interpretation—that a recipient of child's disability benefits does not have the requisite "substantial attachment to the labor force" to qualify for a disability freeze—is neither "beyond the pale of reasonableness" nor inconsistent with the statutory definition of a "period of disability,"

we refuse to substitute our interpretation for the Secretary's (or the plaintiff's) speculation as to what Congress would or would not have done had it spoken to the issue. Since the Secretary's interpretation is reasonable, we uphold the trial court's approval of that interpretation. Consequently, Ransom is not entitled to a statutory "period of disability" basing his eligibility for a "freeze" upon his parents' earnings record.

In reaching our decision, we discern that the parties have waged a policy battle that is more proper before legislative or administrative bodies, not judges. While Congress may have intended to provide reasonable benefit payments to all social security recipients (including those whose period of childhood disability is interrupted by their return to gainful employment) had it considered the question, we are convinced that Congress did not do so with this degree of specificity. Thus, there is a loophole in the statute which we as judges refuse to fill. *Chevron* explains why, under these circumstances, we must accord deference to the Secretary's interpretation when it represents a reasonable accommodation of manifestly competing interests:

"Judges are not experts in the field, and are not part of either political branch of the Government. *Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences.* In contrast, an agency to which Congress has delegated policymaking responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

When a challenge to an agency construction of a statutory provision, fairly conceptualized, *really centers on the wisdom of the agency's policy,* rather than whether it is a reasonable choice within a gap left open by Congress, *the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do.* The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.' *TVA v. Hill,* 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978)."

467 U.S. at 865–66, 104 S.Ct. at 2793 (emphasis added).

### III

■ Although as explained above Ransom is not entitled to a "period of disability" based upon his *father's* "insured status," Ransom additionally asserts that the ALJ failed to inquire whether his personal earnings record qualifies him for a statutory "period of disability" under § 416(i). 42 U.S.C. § 416(i)(3)(B) provides:

"(3) The requirements referred to in clauses (i) and (ii) of paragraph (2)(C) of this subsection are satisfied by an individual with respect to any quarter only if—

\*    \*    \*    \*    \*    \*

(B)(i) he had not less than 20 quarters of coverage during the 40–quarter period which ends with such quarter, or

(ii) if such quarter ends before he attains (or would attain) age 31, not less than one-half (and not less than 6) of the quarters during the period ending with such quarter and beginning after he attained the age of 21 were quarters of coverage, or (if the number of quarters in such period is less than 12) not less than 6 of the quarters in the 12–quarter period ending with such quarter were quarters of coverage, or

(iii) *in the case of an individual* (not otherwise insured under clause (i)), *who,* by reason of clause (ii), *had a prior period of disability that began during a period before the quarter in which he or she attained* age 31, not less than one-half of the quarters beginning after such individual attained age 21 and ending with such quarter are quarters of coverage, or (if the number of quarters in such period is less than 12) *not less than 6 of the quarters in the 12–quarter period ending with such quarter are quarters of coverage"*

42 U.S.C. § 416 (1982 & Supp.III 1985) (emphasis added). Under subdivision 3(B)(iii) of the statutory definition of a "period of disability," Ransom would be eligible for a freeze based on his personal earnings record if he earned at least $50 a calendar quarter over a period of six quarters of coverage in the 12–quarter period ending with the quarter in which his first period of disability began, before he attained the age of 31. The Secretary asserts that Ransom had to fulfill the requirements of subdivision 3(B)(iii) *after* his confinement in a state mental institution until the age of 31. Thus, the Secretary argues, the possibility that Ransom could have met the six quarters of coverage requirement between the ages of 21 and 31 is foreclosed by evidence in the record that he was institutionalized for all but four calendar quarters during those ten years.

But as Ransom points out, § 416(i)(3)(B)(iii) also provides that if an individual is disabled before age 31, and if the number of calendar quarters during the period from age 21 to the time of disability is fewer than 12 (Judge Gordon's decision found Ransom to be disabled *prior to* age 21), the individual needs only six quarters of coverage to qualify for a freeze, and in this situation the statute does not expressly require that those six quarters be earned after age 21. While the parties agree that Ransom earned at least $1,154 before 1950, the record in our opinion fails to establish that Ransom did not earn at least $50 a quarter over a period of six quarters in the 12–quarter period ending with the quarter

in which his first period of disability began, before he was 31.

Accordingly, we affirm the trial court's denial of Ransom's claim for a "disability freeze" basing his eligibility for a "period of disability" upon his parents' earnings record. However, we remand this case to the Secretary for further consideration of Ransom's claim that his personal earnings record qualifies him for a statutory period of disability.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.